Bernard B. CARTER (B. B. Carter) and Tommie Velma Carter, Husband and Wife, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 17162.

United States Court of Appeals Fifth Circuit.

June 30, 1958.

Hutcheson, Chief Judge, dissented.

Wentworth T. Durant, Robert J. Hobby, Dallas, Tex., for petitioners.

Kenneth E. Levin, Atty., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Dept. of Justice, Lee A. Jackson, I. Henry Kutz, Attys., Dept. of Justice, Arch M. Cantrall, Chief Counsel, Charles Owen Johnson, Sp. Atty., I.R.S., Washington, D. C., for respondent.

Before HUTCHESON, Chief Judge, and TUTTLE and CAMERON, Circuit Judges.

TUTTLE, Circuit Judge.

The principal question presented on this petition to review the decision of the Tax Court is whether the court erred in holding that the proceeds of a sale of 386 head of heifers were taxable to petitioner as ordinary income rather than as gain from the sale of a capital asset. The correct answer to that question by the Tax Court depends on whether the cattle in question were a "breeding herd" which thus were "used in the trade or business" or were cattle "held primarily for sale in the ordinary course" of petitioner's business of buying, feeding and selling cattle.

Recognizing our reluctance, which is administratively proper as well as technically required by the statutory standard of review, to overturn findings of fact by the Tax Court, petitioner here contends that the findings themselves require a conclusion contrary to that made by the Tax Court.

The findings of fact made by that Court, and which petitioner contends require a determination that these heifers were used in his trade or business and were not held primarily for sale to customers, thus satisfying the requirements of Section 117(j)(1) of the Internal Revenue Code, 26 U.S.C.A. § 117(j)(1), are:

"The petitioner was in the business of buying and selling cattle

from 1940 through 1948, the year in question. In 1948, income from cattle sales constituted about 60 percent of petitioner's gross income. Prior to 1948, he purchased all of his cattle, rather than raise them. He ordinarily purchased 'stock' cattle which he described as 'anything from a weaner calf up to 3-year-old steers or heifers that hasn't yet much flesh on him and they are at the right stage to put on wheat pastures or grass to where they would put on pounds.' He acquired most of his stocker cattle from Old Mexico where the price was less than it was in the United States. *In the latter part of 1946 or early 1947, after he had contracted to purchase a herd of cattle in Mexico, the Mexican border was closed to cattle exportation because of the hoof and mouth disease. He never received delivery of these cattle. The price of cattle in the United States increased at that time.*

"In April 1947, the petitioner purchased about 800 short 2-year old head of cattle from Roy Williams. These cattle were located on the Pyle ranch, near Pecos, Texas. *This herd contained about one-half heifers and one-half steers. They were good quality Hereford cattle, but were in poor condition. Petitioner separated the steers from the heifers and put them in separate pastures. In June 1947, petitioner put some registered Hereford bulls, which he owned, in with the heifers to serve them. He left the bulls with the heifers until September or October 1947, by which time he considered they had all been bred.*

*"In December 1947, weather conditions rendered it extremely difficult for trucks to haul feed to the cattle. Petitioner then decided to sell all of his cattle, including the heifers which had been bred* [and which are the cattle involved here]. He had about 1,000 head of cattle at that time. About January 17, 1948, petitioner sold 201 yearlings to his brother, Sid. Those cattle were not a part of the herd acquired from Williams in April 1947. The rest of the cattle, i. e., the approximately 800 which he had purchased from Williams were hauled to Oklahoma City and placed in feed lots for the purpose of getting them ready for sale.

"These cattle were all sold by an agency in a series of sales in March and April 1948 \* \* \* The journal does not reflect separately the amounts received for the heifers. The cattle were apparently sold without the heifers and steers being segregated. The petitioner received about $75,000 from the sale of heifers, which constituted about one-half of the 800 cattle in the herd \* \* \*" [Italics indicate the portions principally relied on by petitioner].

In addition to these findings of fact the court, in its conclusion, stated:

"\* \* \* We do not think the record supports a finding that about one-half of the 800 cattle that were purchased from Williams in 1947 were used in petitioner's trade or business of breeding cattle. We do not think that the record would justify us in making a finding of fact that petitioner was engaged in the business of breeding cattle and we have not done so. At most, it indicates a desire to start breeding herd. The record shows, in our opinion, that desire was never fulfilled."

In addition to these findings the petitioner testified to certain purpose and intent motivating his actions which are not rebutted circumstantially or otherwise, and which appear to be accepted at their face value by the Tax Court in its quoted conclusion above: "At most [the record] indicates a *desire* to start a breeding herd. The record shows, in our opinion, that *desire* was never fulfilled." (Italics added). This intent, as testified to by petitioner, was that, since the Mexican border was closed and he would be cut off

from his previous source of supply he would breed his own cattle for raising and sale; it was with that purpose in mind that he bought the 386 heifers; he placed them in a separate pasture with 17 registered bulls to be bred and it was only after they had all been served in the late fall that he put them out on the range.

He further testified that his purpose to build a breeding herd was not changed until the particular weather conditions, which the Tax Court found "rendered it extremely difficult for trucks to haul feed to the cattle," caused him to decide to sell them.

■ Income tax regulations are relied on by the taxpayer to support his contention that a purpose to establish a breeding herd, coupled with action consistent with such purpose when the intention to sell the breeders is brought about by fortuitous circumstances and was not present before such circumstances arose, is sufficient to require a holding that the sale was of breeding stock and not of cattle held primarily for sale to customers.

Treasury Regulation 111, includes the following subsection to Section 27.117–7:

> "Gains and Losses from Involuntary Conversions and From the Sale or Exchange of Certain Property Used in the Trade or Business:
>
> *       *       *       *       *
>
> "(c) *   *   *
>
> "The determination whether or not livestock is held by the taxpayer for a draft, breeding, or dairy purpose depends upon all of the facts and circumstances in each particular case. The purpose for which the animal is held is ordinarily shown by the taxpayer's actual use of the animal. However, a draft, *breeding,* or dairy *purpose may be present in a case where the animal is disposed of within a reasonable time after its intended use for such purpose is prevented by accident, disease, or other circumstance.* An animal held for ultimate sale to customers in the ordinary course of the taxpayer's trade or business may, depending upon the circumstances, be considered held for a draft, breeding, or dairy purpose. An animal is not held by the taxpayer for a draft, breeding, or dairy purpose merely because it is suitable for such purpose or because it is held by the taxpayer for sale to other persons for use by them for such purpose. Furthermore, an animal held by the taxpayer for other purposes is not considered to be held for a draft, breeding, or dairy purpose merely because of a negligible use of the animal for such purpose as an ordinary or necessary incident to the purpose for which the animal is held. (Emphasis supplied).
>
> "These principles may be illustrated by the following examples:
>
> "Example 1. An animal intended by the taxpayer for use by him for breeding purposes is discovered to be sterile, and is disposed of within a reasonable time thereafter. This animal was held for breeding purposes.
>
> "Example 2. The taxpayer retires from the breeding or dairy business and sells his entire herd, including young animals which would have been used by him for breeding or dairy purposes if he had remained in business. These young animals were held for breeding or dairy purposes.
>
> "Example 3. A taxpayer in the business of raising hogs for slaughter customarily breeds sows to obtain a single litter to be raised by him for sale, and sells these brood sows after obtaining the litter. Even though these brood sows are held for ultimate sale to customers in the ordinary course of the taxpayer's trade or business, they are considered to be held for breeding purposes."

We conclude that this reliance by petitioner is well placed. Here the taxpayer purchased these heifers with the stated intent of starting a breeding herd. They were "good quality Hereford cattle." As to the fact of this intent, the Tax Court

conceded it by stating that the record "at most, indicates a desire to start a breeding herd" and "that desire was never fulfilled." It is found as a fact that they were placed in a separate pasture and thus bred by registered bulls; that thereafter they were turned out on the range until, as the Tax Court found, "weather conditions rendered it *extremely difficult* for trucks to haul feed to the cattle." Taxpayer testified that he bought two Army half-truck vehicles to try to pull feed trucks to the cattle, but he was unable to do it. Following its finding as to the extreme difficulty petitioner had hauling feed to his cattle, the Tax Court then said: "Petitioner *then* decided to sell all his cattle, including the heifers which had been bred."

We think that the court's finding that Carter bought these cattle with a desire to start a breeding herd; that he bred them with registered stock; that weather conditions made it extremely difficult for him to feed them; that he *then* decided to sell them; and that his desire was never fulfilled brings the case strictly within the provisions of the regulations quoted above. The Government, in its brief, argues:

"Obviously from the above testimony, it would be impossible to determine what is considered to be severe weather around Amarillo or whether the winter of 1947–1948 was unusually severe or not. The cases show that the development of a good breeding herd requires years, and such weather as taxpayer described must have been foreseeable during such a period of development. If taxpayer really intended to establish a breeding herd, it is hard to believe that he was actually driven out of business by the weather he described. In any event, the evidence being what it was, surely the Tax Court was not bound to conclude that taxpayer sold his cattle primarily on account of the weather."

The obvious answer to this argument is that this is what the Tax Court did find. Of course, the Tax Court is not bound to accept testimony at its face value if it is improbable, unreasonable or questionable, Archer v. Commissioner of Internal Revenue, 5 Cir., 227 F.2d 270, but here the Tax Court did accept petitioner's testimony to the extent of holding that he decided to sell his heifers when the weather conditions made it "extremely difficult" to feed them.

The Government argues that the ultimate finding by the Tax Court that the heifers were held "primarily for sale in the ordinary course of business" should prevail even if there was a secondary purpose to build up a breeder stock. We think this position is untenable because of the specific finding as to when taxpayer decided to sell the cattle. It was not until after his hopes had been frustrated by adverse weather conditions. The court's own language was "Petitioner *then* decided to sell all his cattle." (Italics added). If this is true (and the Government does not attack the finding), then he had no intent to sell them before that. Moreover, if it can be argued that the ultimate finding is to be supported on the assumption that taxpayer had ambivalent purposes, i. e., he bought the cattle intending to fatten and sell them to the best advantage but desiring one calf crop as a hedge before he bred them, and then had to sell before the calves arrived, the third example in the Regulations quoted above seems to contemplate such a situation. At least as to the sows the Regulations seem to recognize that an owner may breed sows to obtain a single litter of pigs to be raised by him for sale and the fact that he then sells the sows and had at all times intended to do so does not prevent them being treated as breeder stock.

We conclude that on the findings made by the Tax Court the result was inescapable. The sale of the heifers was a sale of property "used in the trade or business" and not of property "held primarily for sale to customers in the ordinary course of business." For cases dealing with different phases of this problem, although, as stated by the Regulations, each determination depends on the particular facts

and circumstances, see United States v. Bennett, 5 Cir., 186 F.2d 407; Albright v. United States, 8 Cir., 173 F.2d 339; and McDonald v. Commissioner of Internal Revenue, 2 Cir., 214 F.2d 341.

█ Another issue presented here is one of accounting and proof. Petitioner had always used the inventory method of accounting, using the farm-price method of valuing the cattle. Here these 386 heifers, bought in April 1947, were included in the January 1, 1948, inventory of 1,009 cattle, with a total inventory value of $121,080. Petitioner contended that the basis of these cattle was the proportionate part of $121,080, or $46,080. Although not deciding the case on this point, since the Tax Court went on to consider the principal point already discussed, the court said in a footnote: "Petitioner has not alleged or shown the basis for computing the gain or loss on the sale of the alleged breeding herd * * * In view of the fact that the 1,009 head of cattle contained yearling heifers, 2 year old heifers and steers, we could not assume that they were all included in the inventory at equal values." If it is permissible for the petitioner to treat the gain from the sale of these particular cattle on a capital gains basis, even though not previously carried as a capital asset, and we have heretofore held it is, then it would seem quite possible for the taxpayer to bring forth proof as to the basis of these 386 head upon remand for that purpose. The Government does not contend in its brief before us that the petition should be dismissed because of the failure to prove the amount of the gain. As to this point the brief merely commented in a footnote: "The Tax Court did not think taxpayer had proved the basis for computing gain on the sale of his alleged breeding herd even on the inventory basis."

However, after the Tax Court decision in this case, this Court decided Scofield v. Lewis, 5 Cir., 251 F.2d 128, 130, in which we held invalid the portions of Regulations 111, Sec. 29.22(c)–6, that required a taxpayer who elected to use the "unit-livestock-price method" to apply it to all livestock *raised* whether for sale or for breeding, draft or dairy purposes. In that case this Court held that the regulation requiring a taxpayer using the "unit-livestock-price method" to apply it to breeding herd was not supported by the statute. However, the regulation there criticized did not require such application if the breeding herd was *purchased* instead of *raised*. It specifically provided: "A livestock raiser who uses the 'unit-livestock-price method' must include in his inventory at cost any livestock purchased, *except that animals purchased for breeding,* dairy or draft purposes *can*, at the *election* of the livestock raiser, be included in inventory *or treated as capital assets* * * *" (Italics added).

██ On the basis of the Lewis case, in this Court for the first time, Petitioner claims that he should now be permitted in effect to treat these animals as a capital asset and show the gain on the basis of cost to him rather than using the inventory figure as the basis. We think this contention must fail for several reasons. In the first place we think the principle of the Lewis case should not be extended beyond its own facts. It is a long established rule of tax procedure that an accounting method once adopted may not be varied or departed from at will by the taxpayer. No injury results generally to the taxpayer. Taxpayers are permitted considerable choice in their selection of a method of accounting, and so long as the available choices permit them to use a method that at once reflects true income and leaves available to them the benefits of all special treatment afforded by the law, there can generally be no criticism of the requirement that they stick to the accounting method chosen rather than change to a different recognized one or some hybrid method. Moreover, since even taxpayers using the "unit-livestock-price method" are permitted by the regulations to keep their breeding herds, if acquired by *purchase*, out of inventory and treat them as a capital asset, they are in no way hurt by the part of the regulation that we held improperly oper-

ated against Lewis, who, as to a breeding herd *raised* by him, was given no such option. We therefore conclude that Scofield v. Lewis would have no application to the facts here, even if this taxpayer had been on the "unit-livestock-price method" or accounting which he was not.

It therefore amounts simply to an effort by petitioner, in his desire to use his cost rather than inventory as a basis, retroactively to change his method of accounting, which cannot be done. He was permitted under the regulations on the "farm-price" method of valuing inventory to exclude his breeding herd from inventory if he had chosen to do so. Not having made that election when he acquired the herd, he cannot retroactively make the change. See SoRelle v. Commissioner, 22 T.C. 459, and Frost v. Commissioner, 28 T.C. 1118.

We conclude, therefore, that petitioner was entitled to treat the sale of the 386 heifers in question as a sale of a capital asset, but their basis must be computed in light of their having been included in inventory. Taxpayer should be afforded an opportunity to make proof of such basis if he failed to do so on the record before us.

The decision of the Tax Court is not challenged as to several items found for the Commissioner. As to these matters, of course, it is affirmed.

The judgment is affirmed in part and reversed in part and the case is remanded for further proceedings not inconsistent with this opinion.

HUTCHESON, Chief Judge (dissenting).

In my view, the Tax Court clearly, categorically and correctly found: that taxpayer's primary business was buying, feeding and selling cattle; that he was not in the business of breeding cattle and had not established a breeding herd; and that the heifers in question were not used in such trade or business but were held for sale in the ordinary course of taxpayer's primary business; and the find-ing in my opinion was not clearly erroneous.

I cannot, therefore, accept the exegis by which my brothers, darkening counsel and making the worse cause seem the better, have come up with the conclusion that the Tax Court's clear and positive finding:

> "We do not think that the record would justify us in making a finding of fact that petitioner was engaged in the business of breeding cattle, and we have not done so. At most it indicates a desire to start a breeding herd. The record shows in our opinion that that desire was never fulfilled."

was a finding in favor of, rather than against, taxpayer's contention.

The Tax Court clearly found that the heifers were held primarily for sale in the ordinary course of business. This finding, which I think the record clearly supports, was not erroneous, and we ought not to reverse it.

I respectfully dissent.