**UNITED STATES of America,**
**Appellant,**

v.

**Harold M. EKBERG and Secrie Ekberg,**
**Appellees.**

**No. 16539.**

United States Court of Appeals
Eighth Circuit.

June 21, 1961.

Kenneth E. Levin, Atty., Tax Div., Dept. of Justice, Washington, D. C., for appellant. Howard A. Heffron and Abbott M. Sellers, Acting Asst. Attys. Gen., Lee A. Jackson and Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., on the brief.

Thomas H. Foye, Rapid City, S. D., for appellees. Donn Bennett, Buffalo, S. D., and Bangs, McCullen, Butler & Foye, Rapid City, S. D., on the brief.

Before JOHNSEN, Chief Judge, and VOGEL and BLACKMUN, Circuit Judges.

BLACKMUN, Circuit Judge.

This case involves questions of federal income tax accounting and return treatment of a rancher's breeding cattle for the calendar years 1954, 1955 and 1956.[1] In the center of the controversy are (a) the 1954 Internal Revenue Code's § 1231 (b) (3), 26 U.S.C.A. § 1231(b) (3), defining breeding livestock held 12 months or more as "property used in the trade or business", and (b) § 1.471–6(f) of the Code's Regulations providing:

"A taxpayer who elects to use the 'unit-livestock-price method' must apply it to all livestock raised, whether for sale or for draft, breeding, or dairy purposes. * * *"

Two questions are presented:

1. Was this taxpayer, under Regs. § 1.471–6(f), improperly required to subject his raised breeding livestock to the unit-livestock-price method?

2. May the taxpayer recover his breeding stock's unit values through amortization deductions?

The taxpayers are husband and wife.[2] They timely filed joint federal income

---

1. Two minor issues were contested in the trial court. One was decided in favor of the taxpayers and one against them. These issues are not before us on this appeal.

2. Mrs. Ekberg's interest lies in the fact that she filed joint returns with her husband. The ranch operations herein described are those of Mr. Ekberg. Any reference to the "taxpayer" in the singu-

tax returns for each of the three taxable years involved. They reside in Harding County, South Dakota. There Mr. Ekberg owns and operates a ranch of substantial acreage. For some years he has been engaged in the business of raising high quality purebred Aberdeen Angus cattle. For that purpose he constantly has maintained a breeding herd in addition to his other cattle. Additions to this herd are made only with heifers which he has raised; no additions are made through purchase. All heifer calves born in the breeding herd are held for breeding purposes until designated otherwise.

The taxpayer has kept his books and records on the accrual basis of accounting; because of this, he has been required by the applicable Regulations,[3] § 1.61–4(b), to use inventories to determine gross income. He has also employed the "unit-livestock-price method" of valuing his livestock inventory; because of this, he has been required by the applicable Regulations, § 1.471–6(f), to apply that method to his breeding livestock as well as to his cattle held for sale. Specifically, he has assigned, in the taxable year of birth, a full unit price of $70 to each new heifer. Evidently this unit evaluation has met with the approval of the District Director of Internal Revenue for it is not now questioned.

This addition to inventory at the unit price of each new heifer in the breeding herd results in an increase in the taxpayer's ordinary income for the taxable year and in a reduction in the gain, if any, upon the animal's subsequent disposition. If, in contrast, the taxpayer could carry each breeding animal at a zero basis, as would be the case if he used the cash receipts and disbursements method, its birth would not create ordinary income, its net disposition price

would constitute gain in its entirety rather than in part, and, with all other qualifying factors satisfied, that gain would be afforded capital gains treatment rather than ordinary income treatment. The taxpayer presumably, as is the case for each of the three taxable years here, would then enjoy a lower income tax.

Mr. Ekberg endeavored to obtain this tax benefit. He encountered opposition, however, from the tax authorities because of his use of the accrual-inventory method of accounting and of the unit-livestock-price method of evaluation. In 1951 and again in 1952 he was not permitted to remove his breeding cattle in its entirety from inventory and to reduce in one year each head's $70 unit value to zero. He then adopted another approach. In 1954 he removed from inventory only his yearling heifers in the breeding herd and, instead, included and expressly described them among other assets in his return's depreciation schedule. A deduction for "depreciation" upon the heifers, computed so as to recover the existing unit valuations over a six-year period, was taken. He did the same thing in 1955 and 1956. The Internal Revenue Service disallowed these deductions.[4] Deficiency assessments resulted and were paid.

The present action is to recover those payments. The case was tried to the court sitting without a jury and resulted in judgment for the plaintiffs. The government has appealed.

The trial court found as a fact that the taxpayer "without the consent of the Commissioner of Internal Revenue, changed the 'accrual method' of reporting * * * income, but only to the extent of transferring breeding livestock * * carried in inventory under the 'unit-price method' to the depreciation schedule". It also found that the Commissioner's

lar, while primarily directed to him, is applicable to both husband and wife.

3. Hereinafter, unless otherwise described, section references are to the 1954 Code and to 26 U.S.C.A., and regulations references are to the Regulations issued under the 1954 Code.

4. Supposedly (although the record before us is not clear as to this), the Service correspondingly refused to permit capital gains treatment of the *entire* difference between sale price and carrying value, as reduced by these deductions, upon the disposal of breeding animals during these years.

consent for this was not required. It concluded, largely upon the authority of Scofield v. Lewis, 5 Cir., 251 F.2d 128, that the taxpayer had the right unilaterally to make this change and to claim the "depreciation" deductions, that this did not amount to a change in accounting method, and that the taxpayer, by the deductions, "achieved" capital gains treatment approximating that accorded breeders on a cash basis.

Two things merit initial mention:

(a) We are not concerned here with the question whether the taxpayer's net gains realized upon the disposition of breeding cattle and other property "used in the trade or business", and held for the required period of time, are entitled to capital gains treatment. The government concedes this. Among the many cases so holding are Albright v. United States, 8 Cir., 173 F.2d 339, and United States v. Cook, 8 Cir., 270 F.2d 725. This is so even though the taxpayer has included his breeding stock in inventory. Fawn Lake Ranch Co., 12 T.C. 1139, 1144, appeal dismissed, 8 Cir., 180 F.2d 749; SoRelle, 22 T.C. 459, 473–474; Estate of C. A. Smith, 23 T.C. 690, 705; Scofield v. Lewis, supra; Carter v. Commissioner of Internal Revenue, 5 Cir., 257 F.2d 595; Herbert A. Nieman & Co., 33 T.C. 451, 462.

■ (b) The case is rendered somewhat confusing by the taxpayer's questionable use of the word "depreciation" to describe his claimed amortization of unit evaluations and by his inclusion of breeding cattle in his returns' depreciation schedules. The deductions claimed as "depreciation" are actually items asserted, with respect to animals which had not reached maturity, in order to counteract, by amortization, the prior inclusion in inventory and ordinary income of breeding animals at birth at the unit evaluations. We therefore are not dealing with the usual income tax concept of depreciation related to exhaustion and wear and tear of trade or business or income producing property provided for under § 167(a), 26 U.S.C.A. § 167(a). True depreciation of that kind is not assertable on inventory livestock. Regs. § 1.167(a)–6(b); SoRelle, supra, at p. 474 of 22 T.C.; Frost, 28 T.C. 1118.

The government's position is that this taxpayer has freely selected and uses the accrual-inventory method of accounting and the unit-livestock-price method of evaluation; that his breeding livestock is raised, not purchased; that it has been carried in inventory; that it cannot now be removed from inventory without the Commissioner's consent because this involves a change of accounting method; and that the Commissioner has not given his consent.

The taxpayer's position is that he is entitled to remove his raised breeding livestock from inventory and to achieve a zero income tax basis for it because of the policy behind § 1231(b) (3) to provide broad tax benefit for breeding livestock raisers; that his livestock was placed in inventory because Regs. § 1.471–6(f) requires it; that this requirement was rendered obsolete with the statutory change effected in § 1231's predecessor by the Revenue Act of 1951 and is now improper; that he may amortize his improperly-required inventory valuations by appropriate annual deductions; and that so doing does not effect a change in accounting method which needs the Commissioner's consent.

Because the case concerns involved farm accounting problems, it is desirable to review the applicable provisions of the 1954 Code and of its accompanying Regulations and then to emphasize some features of their relevant history. We do this in the margin.[5]

5. *The Code and the Regulations.* A taxpayer's taxable income shall be computed upon the accounting method by which his books are kept. § 446(a). Recognized and permitted general methods of accounting include the cash receipts and disbursements method, an accrual method, and combinations of these. § 446(c). The cash receipts and disbursements method generally contemplates the inclusion of income for the year in which received and the allowance of deductions

The Code and Regulations in summary provide that:

a. A farmer or rancher may use either a cash receipts and disbursements method or an accrual method of accounting.

b. Once having selected his accounting method, it is binding upon him for

for the year in which paid. The accrual method generally relates income and deductions to the year in which earned or incurred. Regs. § 1.446–1(c) (i) and (ii). A taxpayer filing his first return may adopt any permissible method of accounting. Regs. § 1.446–1(e) (1). Once having chosen his method, however, the taxpayer, if he wishes to change it and before computing his taxable income under a new method, must secure the consent of the Commissioner. § 446(e) and Regs. § 1.446–1(e) (2).

A farmer—and this includes a rancher such as the taxpayer here, Regs. § 1.-61–4(d)—has, as does any other taxpayer, the same initial choice of accounting method. He may use the cash receipts and disbursements method or he may use an accrual method. Having elected one method, he must stay with it for subsequent years unless authorized by the Commissioner to change his method. Regs. § 1.471–6(a). If, however, he uses the accrual method then he must use inventories to determine his gross income. Livestock raised or purchased for sale shall be included in the inventory at their proper valuation, and livestock "acquired for draft, breeding, or dairy purposes and not for sale may be included in the inventory * * * instead of being treated as capital assets subject to depreciation, provided such practice is followed consistently from year to year by the taxpayer". Regs. § 1.61–4(b).

Section 471 relates to inventories. A taxpayer's inventory practice "should be consistent from year to year". Regs. 1.-471–2(b). While the most commonly used valuation bases are (1) cost or (2) cost or market, whichever is lower, Regs. § 1.471–2(c), it is recognized that there is "difficulty of ascertaining actual cost of livestock and other farm products". As a consequence, farmers who raise livestock "may value their inventories of animals according to either the 'farm-price method' or the 'unit-livestock-price method'". Regs. § 1.471–6(c). The farm-price method provides for valuation at market price less direct cost of disposition. Regs. § 1.471–6(d). The unit-livestock-price method provides for valuation of different classes of animals at a standard unit price (which is reasonably to account for the normal costs incurred) for each animal within a class. Regs. § 1.471–6 (e). Then Regs. 1.471–6(f), quoted

supra, provides that a taxpayer who elects to use the unit-livestock-price method *must* apply it to all livestock *raised* including breeding animals. This means that a livestock raiser who uses this method cannot segregate his *raised* breeding herd and treat it as though it were a capital asset subject to depreciation after maturity. In contrast, a livestock raiser who uses the unit-livestock-price method must include in his inventory at cost any livestock *purchased* "except that animals purchased for draft, breeding, or dairy purposes can, at the election of the livestock raiser, be included in inventory or be treated as capital assets subject to depreciation after maturity". Regs. § 1.471–6(g). The Regulations thus distinguish between *raised* breeding livestock and *purchased* breeding livestock for a taxpayer using the unit-livestock-price method.

Section 167(a) permits, as one of the itemized deductions, a reasonable allowance for depreciation of property used in the trade or business. "Livestock acquired for work, breeding, or dairy purposes may be depreciated unless included in an inventory used to determine profits. * * * "

Section 1201 et seq. concern capital gains and losses. It is usually to the advantage of a taxpayer to be able to treat a gain as a capital gain rather than as ordinary income, § 1221 defines the term "capital asset" to mean generally "property held by the taxpayer". Excluded from this definition, however, are stock in trade; inventory property; property held primarily for sale in the ordinary course of business; property used in the trade or business, subject to the depreciation allowance; and certain other described property. Inasmuch as ranching is a trade or business, livestock, under § 1221, is outside the definition of capital assets whenever it is inventory property or is "held * * * primarily for sale" or is "used" in the business and subject to the depreciation allowance. § 1221, however, does not stand alone. Accompanying it is § 1231 which relates to "property used in the trade or business" and provides capital gains treatment for net gains realized upon the disposition of this kind of property. § 1231(b) defines "property used in the trade or business" and § 1231(b) (3) has this definition specifically include "livestock,

income tax purposes for subsequent years unless the Commissioner consents to a change.

c. If he uses an accrual method, he must use inventories.

> regardless of age, held by the taxpayer for draft, breeding, or dairy purposes", for 12 months or more. The Regulations, of course, recognize the application of § 1231 to draft, breeding, or dairy livestock. Regs. § 1.1231–1(c) (4). The term "livestock", furthermore, "is given a broad, rather than a narrow interpretation". Regs. § 1.1231–2(a).
>
> *The History of the Statute.* § 117 of the 1939 Code concerned capital gains and losses and corresponds with § 1201 et seq. of the 1954 Code. § 117(a) gave the same broad general definition to "capital assets" as does the present § 1221 and then excluded from that definition the same 4 categories of stock in trade, inventory property, property held primarily for sale to customers in the ordinary course of business, and property, used in the trade or business, subject to the depreciation allowance. (It contained, however, none of the present Code's exclusionary references to discounted obligations, trade or business real estate, copyrights and the like, and accounts and notes receivable. The first three of these exclusions appeared in § 117(a) by way of amendments effected by the Revenue Acts of 1941, 1942 and 1950, respectively, and the last came only with the 1954 Code.)
>
> There was nothing in the 1939 Code, as originally enacted, which corresponded to § 1231 of the 1954 Code relating to property used in the trade or business. § 1231's predecessor was § 117(j) of the amended 1939 Code; it appeared, however, only when it was added by § 151 (b) of the Revenue Act of 1942. This new § 117(j) defined "property used in the trade or business" to be property so used which was subject to the depreciation allowance and held for more than 6 months, and trade or business real property held for more than 6 months, which was not inventory property or held primarily for sale. (Subsection (j)'s inclusion of timber and of coal in the definition were added by the Act of February 25, 1944, 58 Stat. 46, 47, and by the Revenue Act of 1951, respectively, and its exclusion of copyrights, etc. from the definition was effected by the Revenue Act of 1950.) Not until the enactment of the Revenue Act of 1951, § 324, did § 117(j) of the 1939 Code include within its definition of "property used in the trade or business" the present specific reference to "livestock, regardless of age,

d. If he uses inventories and if he raises livestock, he must value that livestock for the inventory either by the farm-price method or by the unit-livestock-price method.

> held by the taxpayer for draft, breeding, or dairy purposes", for 12 months or more, now, found as § 1231(b) (3) of the 1954 Code. This part of the 1951 amendment, however, by its terms was made applicable to taxable years beginning after 1941.
>
> *The History of the Regulations.* Regulations 111 relate to the 1939 Code. § 29.22(c)–6 thereof, as originally issued on October 26, 1943, concerned inventories "of livestock raisers and other farmers". It stated that, "because of the difficulty of ascertaining actual cost of livestock and other farm products, farmers who render their returns upon an inventory basis may value their inventories according to the 'farm-price method.' * * * " It contained no specific mention of breeding livestock. This section was amended in December 1944 by T.D. 5423, 1945 C.B. 70. This permitted farmers raising livestock to value inventories according to either the farm-price method or the unit-livestock-price method. It amended existing paragraphs to conform (except for minor particulars not pertinent here) with the present Regs. § 1.471–6(c) and (d) and added new material identical (except for inconsequential details) to the present Regs. § 1.471–6(e) · to (h), inclusive. That portion of Regs. § 29.22(c)–6, as so amended in 1944, which corresponds to the present Regs. § 1.471–6(f), read as follows:
>
> "A taxpayer who elects to use the 'unit-livestock-price method' must apply it to all livestock raised, whether for sale or for breeding, draft, or dairy purposes. Once established, the unit prices and classifications selected by the taxpayer must be consistently applied in all subsequent years in the valuation of livestock inventories. No changes in the classification of animals or unit prices will be made without the approval of the Commissioner."
>
> (This language also appears in Regs. 118, § 39.22(c)–6, issued in 1953 and applicable to taxable years beginning after 1951.) Sec. 29.117–7 of Regulations 111, relating to capital gains treatment on the disposition of certain non-capital assets, was amended by T.D. 5970, issued January 6, 1953, 1953 C.B. 183, to include provisions applicable to draft, breeding or dairy-purpose livestock, and was occasioned by the change in the statute effected by the 1951 Act.

e. If he uses inventories and if he raises livestock and if he uses the unit-livestock-price method of evaluation, he must apply that method to all livestock *raised*, including breeders, but as to breeding livestock *purchased* he has the option of including it in inventory or of treating it as a capital asset subject to depreciation after maturity.

f. His breeding livestock held a year or more qualifies as property used in the trade or business.

The history of the Code and Regulations shows that:

a. Regs. § 1.471–6(f), with its emphasis on *raised* breeding livestock and on the compulsory extension to it of the unit-livestock-price method, when that method has once been selected by the rancher, orginated in 1944.

b. Specific statutory references to breeding livestock and its inclusion in the definition of "property used in the trade or business" appeared in the statute for the first time with the 1951 Act (although made retroactive to taxable years beginning after 1941).

c. The Regulations paragraph which the present taxpayer finds offensive under the 1954 Code thus antedated the statute by almost 7 years.

d. This Regulations paragraph is one issued under the Code's § 471 which has to do with inventories, whereas breeding livestock's qualification for capital gains treatment, so far as the statute is concerned, lies in § 1231(b) (3).

e. The question precisely presented, therefore, is whether this preexisting paragraph of the Regulations under § 471 has valid application to this taxpayer for calendar years subsequent to the change effected by the 1951 Act in what is now § 1231(b) (3).

So much for the bare aspects of the Code, the Regulations and their history. Statutory changes, however, are often prompted by decided cases and administrative attitude. We find here that developments along this line were forthcoming and are revealing. We list chronologically those which are particularly emphasized by the parties:

(a) I.T. 3666, 1944 C.B. 270, was issued in response to an inquiry concerning the application of the 1939 Code's § 117(j) (as it read after the 1942 Act and before the 1951 change) to gains and losses upon the disposition of draft, breeding or dairy livestock. The ruling clearly shows that the Bureau of Internal Revenue regarded the benefits of § 117 (j) as available to the farmer irrespective of whether the livestock was raised or purchased, of whether the accrual or cash basis was used and of whether the stock was or was not inventoried. However, animals culled from the herd in the regular course of business were denied this treatment.

(b) I.T. 3712, 1945 C.B. 176, resulted from confusion arising out of the qualification just mentioned. It established an abnormal-normal sales test for determining whether sales of livestock were or were not entitled to the benefits of § 117 (j). It set up a prima facie standard that reductions in the herd would be presumed to be of animals held for breeding purposes but that additions to the herd would occasion ordinary income treatment for animals sold.

(c) A letter dated August 4, 1947, issued from the Commissioner in response to an inquiry from the Chairman of the Senate Finance Committee. See Albright, supra, at page 343 of 173 F.2d. The Commissioner here adhered to the position taken in the two I.T. rulings relative to the sale of culls as ordinary income, acknowledged that the solution depended upon the facts of each case, and stated that the term "culls" also represented animals regularly sold from the breeding herd in order to keep it at a desired size.

(d) In 1949 Albright v. United States, 8 Cir., 173 F.2d 339, was decided by this court with one dissent. This concerned the proper tax treatment of 1945 and 1946 profits realized upon sales of livestock from a dairy herd and from a breeding hog herd. The court reviewed § 117 (j) of the 1939 Code, as then amended.

and the three rulings and held that net gains realized upon the disposition of such property were entitled to capital gains treatment by a taxpayer on the cash receipts and disbursements basis. It noted that § 117(j) "provided an entirely new method of reporting gains and losses on the sale of noncapital assets used in the trade or business" and that the taxpayer's sales were prompted by a need to maintain his herd at an appropriate size. This court refused to accept the restriction of the prior rulings to sales aimed at herd reduction and concluded that "the interpretations of the Commissioner are contrary to the plain language of section 117(j) and to the intent of the Congress expressed in it",[6] at pages 344–345 of 173 F.2d.

(e) Mim. 6660, 1951–2 C.B. 60, was issued following Albright and United States v. Bennett, 5 Cir., 186 F.2d 407, which had reached the same result. The ruling stated that the Service had reexamined its position. It held that gains realized from the sale of breeding animals came within the purview of § 117(j) if it was established "that the particular animals sold were actually used for dairy, draft or breeding purposes for substantially their full period of usefulness". This thus still denied generally the benefit of § 117(j) to younger animals. I.T. 3666 and I.T. 3712 were revoked.

(f) Senate Report No. 781, 82d Cong., 1st Session, 1951–2 C.B. 458, 487, contained comments upon the changes proposed in § 117(j) by the then pending Revenue Act of 1951. It recited the existence of "considerable confusion and dispute for several years" as to the use or sale aspects of livestock held for breeding purposes. It referred to the two I.T. rulings, to Albright and Bennett, to Mim. 6660, and to "new uncertainties" resulting from this last ruling. It stated that in view of these uncertainties the House

bill was being expanded by the Senate so as to include livestock "regardless of age" held by the taxpayer for breeding, etc., purposes for a year or more.

(g) Mim. 6776, 1952–1 C.B. 71, issued after the 1951 Act. It revoked Mim. 6660 and held that, with the addition to the statute effected by the Act, "under appropriate circumstances" gains from sales of breeding livestock were subject to capital gains treatment. The two I.T. rulings were not thereby reinstated.

(h) Scofield v. Lewis, supra, 5 Cir., 1958, 251 F.2d 128, concerned cash basis taxpayers who were members of an accrual basis ranching partnership. The years involved were 1946 through 1949. The partnership sold animals from its breeding herd. It included its breeding livestock, from 1939 on, in inventory and used the unit-livestock-price method. After the decisions in Albright and Fawn Lake, supra, and in Emerson, 12 T.C. 875, the taxpayers filed claims for refund for the differences between the taxes paid on their profits from sales of breeding stock at ordinary income rates and the amounts they would have paid on a capital gains approach. The government claimed that the taxpayers, having used the unit-livestock-price method, could not change to a cash basis and take breeding stock out of inventory without the Commissioner's consent. The district court entered judgment for the taxpayers. The 5th Circuit affirmed. It stressed the requirement of the Regulations to the effect that if the unit-livestock-price method was used for the sale herd it also had to be used for breeding animals and concluded that this was an unreasonable restriction. It found nothing in the 1951 amendment or in the original statute which indicated a congressional design to limit capital gains treatment because of prior use of the unit-livestock-price method. It held:

---

6. Albright was followed by the 5th Circuit in United States v. Bennett, 1951, 186 F.2d 407, by various United States District Courts, Mitchell v. United States, N.D. Cal.1951, 96 F.Supp. 473, 474; Miller v. United States, D.Neb.1951, 98 F.Supp.

948; Colvert v. United States, E.D.Okl. 1951, 101 F.Supp. 673, and by the Tax Court, Emerson, 1949, 12 T.C. 875; Fawn Lake Ranch Co., 1949, supra; and Flato, 1950, 14 T.C. 1241, 1250, affirmed on other grounds, 5 Cir., 195 F.2d 580.

that the entire sales price was entitled to capital gains treatment and that it was not to be limited to that portion thereof in excess of inventory value.[7]

(i) Carter v. Commissioner of Internal Revenue, supra, 5 Cir., 1958, 257 F.2d 595, involved a taxpayer using inventories and the farm price method. The court denied the taxpayer's claim that the capital gains treatment to which he was entitled with respect to his purchased livestock should be measured from cost rather than from inventory figures. In response to his reliance upon Lewis, the court observed that Lewis was not to be extended "beyond its own facts". The earlier case was held not to apply to this taxpayer-purchaser because, under the Regulations and in contrast to the Lewis situation, he possessed the option to carry the animals in inventory or to treat them as capital assets and had made his choice. A change in that choice would amount to a change in the method of accounting and was not permissible. Gibbs, 33 T.C. 27, 30, is to the same effect. See also Rev. Rule 60-60, 1960-1 C.B. 190.

These rulings and cases enable us to make certain additional observations:

a. Controversy and litigation have centered primarily upon the question whether particular livestock qualifies as breeding stock, so as to be entitled to capital gains treatment, and, secondarily, upon the question of proper basis. The former, as has been noted above, is not involved here.

b. In spite of the Bureau's recognition, as far back as I.T. 3666 in 1944, that raised breeding livestock, if held for the required period, was entitled to the benefit of the 1939 Code's § 117(j), even though it had been inventoried, there is much to be said for the taxpayer's forceful suggestion that the Commissioner, as a practical matter, and largely without success, has consistently resisted and attempted to limit the allowance of capital gains treatment to breeding livestock.

c. These authorities, and other decided cases, conclude, however, that cattle, once its status as raised breeding livestock is established, is entitled on disposition to have net gains treated as capital gains.

d. The Service's successive restrictions in its rulings, and its application of Regulations 111, § 29.22(c)-6, as amended, (corresponding with the present Regs. § 1.471-6(f)) to a unit-livestock-price method taxpayer's raised breeding livestock in the single litigated case involving that narrow issue, have been held invalid.

With this background material we come down to the two questions presented by this case:

1. The validity of Regs. § 1.471-6(f). Clearly this requires that the taxpayer, once having selected the unit-livestock-price method, must apply it to his breeding livestock. Just as clearly, as has been shown above, this was the requirement of the Regulations prior to the 1951 change in the statute. It is on this chronological fact that the taxpayer primarily rests his claim of invalidity of the Regulation's application to him.

We have recently reiterated, with supporting citations, that administrative construction of a statute is entitled to great weight; that regulations are to be sustained unless unreasonable and plainly inconsistent with the statute; that one who claims that a regulation is invalid has the heavy burden of so demonstrating; that regulations, however, cannot be arbitrary; and that they must have a basis in the statute and be within the authority granted the administrative agency. Review Committee Venue VII, etc. v. Willey, 8 Cir., 275 F.2d 264, 272, certiorari denied 363 U.S. 827, 80 S.Ct. 1597, 4 L.Ed.2d 1522.

On the other hand, we must recognize (a) that the capital gains pro-

---

7. It is not apparent from the opinion just how the reduction to zero basis was effected. One may presume that it was accomplished by removal from opening inventory. Compare Little, 34 T.C. 156.

visions of the Code were intended as a relief measure, Helvering v. Bliss, 293 U.S. 144, 148, 55 S.Ct. 17, 79 L.Ed. 246; (b) that the same is to be said of those provisions added by the Revenue Act of 1942 as subsection (j) to § 117 of the 1939 Code, and of the livestock reference added to § 117(j) by the Revenue Act of 1951, Albright v. United States, supra, at page 344 of 173 F.2d; United States v. Cook,.supra, at page 728 of 270 F.2d; Hazard, 7 T.C. 372, 376; Farry, 13 T.C. 8, 13; Fawn Lake Ranch Co., supra, at pages 1143–1144 of 12 T.C.; (c) that there is nothing in the statute which indicates an intent on the part of Congress to deny the Act's relief to any taxpayer whose transactions meet the prescribed conditions, Albright v. United States, supra, at page 344 of 173 F.2d; Emerson, supra, at page 879 of 12 T.C.; Scofield v. Lewis, supra, at page 132 of 251 F.2d; and (d) that the statute, in its application to livestock, "is not to be given more liberal treatment than when applied to any other asset covered by the section". Clark, 27 T.C. 1006, 1014.

■ Was this taxpayer arbitrarily or unreasonably restricted by Regs. § 1.471–6(f) so that he was denied the relief intended by Congress? He claims that he was, that his breeding stock was included in inventory only because he was compelled so to include it by this Regulation, and that Scofield v. Lewis, supra, is in point in his favor. The Lewis case does indeed frown upon what it regards as an element of compulsion and does provide some support to the taxpayer's position when it holds the Regulations section invalid in its ultimate effect upon income tax basis. That case, as this one does, involved accrual accounting (in the part-

nership), the use of inventories, and the unit-livestock-price method. The 5th Circuit said, at page 132 of 251 F.2d:

"A taxpayer in the business of raising cattle who maintained breeding stock as well as a herd raised for sale could not, under the Regulations, elect to use the unit-livestock-price method of inventory values as to the herd raised for sale without using the same method as to the breeding animals and thus be required to use an accrued basis as cost upon making sales. As to a taxpayer who had commenced such procedure before the decision in the Albright case and those subsequent to it, the Commissioner insisted that the unit-livestock-price inventory accruals be continued until his consent was given to a change, and at the same time refused to consider any applications to remove the breeding stock from the inventories. This, we think, was not what the Congress intended. We find nothing in the 1951 amendment to Section 117(j), or for that matter in the Section as originally passed, indicating a Congressional design to limit the extent of capital gains treatment accorded to taxpayers selling animals from a breeding or dairy herd because of their prior election to use the unit-livestock-price method. The problem involves accounting practices and, to be sure, methods of accounting in some circumstances may be determinative of tax liability, but such is not the case here. Animals in a breeding herd are capital assets * * *." [8]

---

8. The characterization in the quoted language of breeding livestock as "capital assets" is, of course, not technically correct. § 117(j) of the 1939 Code, as amended, and § 1231(b) (3) do not so define such livestock. These sections merely allow net gains on the disposition of certain trade or business property to receive capital gains treatment. This may or may not be a distinction without a difference. The term "capital assets"

has been employed elsewhere. See, for example, Greer, 17 T.C. 965, 970; Fox v. Commissioner of Internal Revenue, 4 Cir., 198 F.2d 719, 723. In other cases, however, such assets have been carefully described not as capital assets but as items the net gains of which are entitled to capital gains treatment. See, for example, Albright v. United States, supra, at page 342 of 173 F.2d; Fields, 14 T.C. 1202, 1215, and the same case on appeal,

After careful consideration, however, we feel that Lewis should not be controlling here and, to the extent, if any, that it is in conflict with the conclusions we reach, we disagree with it and do not follow it. Our reasons for so doing are:

a. The Court itself, in Lewis, emphasized, at page 131 of 251 F.2d, that the sole issue there was that of proper tax basis. This aspect permeates the case. The Court was concerned with the contrast in basis possessed by the cash accounting taxpayer and that possesed by the accrual accounting taxpayer. No mention was made of the possible advantages which a non-zero basis accrual taxpayer possesses. Some of these have since been noted in Little, 34 T.C. 156, 159:

"There are advantages in using such a method. There may be years, particularly while such a business is in its formative stage, when expenses exceed income and deductions are not beneficial. Taking raised breeding animals into inventory under the 'unit-livestock-price' method would result in reporting some income for those years to offset expenses. The amount taken into inventory in any year is available as a basis when culls are sold and is also a basis against which to compute depreciation while the animals are used for breeding purposes. There are no doubt other advantages to taxpayers using such an inventory method."

b. Lewis was definitely limited by Carter, supra, decided by the same court only five months later. There it was said, at pages 600, 601, of 257 F.2d:

"In the first place we think the principle of the Lewis case should not be extended beyond its own facts. * * * We therefore conclude that Scofield v. Lewis would have no application to the facts here, even if this taxpayer had been on

the 'unit-livestock-price method' or (of) accounting which he was not."

c. Lewis, it seems to us, goes off on the assumed lack of an available and timely option for the taxpayer. Being on the accrual-inventory method of accounting and being on the unit-livestock-price system of evaluation, the taxpayer by the Regulation did not have the choice between inventorying or capitalizing his raised breeding livestock as he would have had, with respect to any purchased breeding livestock, under § 29.22(c)–6, as amended, of Regulations 111, the predecessor to the present Regs. § 1.471–6(g). The taxpayer, however, was in this position as a result of his own initial selection of the unit-livestock-price system. This initial option he possessed under that portion of Regulations 111, § 29.22(c)–6, as amended, corresponding to Regs. § 1.471–6(a) and (c). He could have selected the farm-price method of evaluation or the cash method of accounting. Having selected his system as a matter of free choice, he must assume its burdens as well as its benefits.

d. The fact that the Regulation complained of antedated the 1951 change in the statute is no answer. If this fact stood alone it might be significant. The 1951 inclusion, by what is now § 1231(b)(3), of breeding livestock within the definition of property used in the trade or business, however, added nothing to the law as it theretofore stood and as it had been interpreted. I.T. 3666, supra, itself recognized the availability of § 117(j) of the 1939 Code, as amended, to breeding livestock and Albright and the other cases cited above were consistently to the same effect. The statute came into being not because of contrary case law which Congress disapproved but because of the Commissioner's continuing reluctance to give full application of the statute to breeding stock:

"The purpose of the 1951 amendment was chiefly to clarify the issue and to recognize by statutory en-

Fields v. Commissioner of Internal Revenue, 2 Cir., 189 F.2d 950, 951; Fox, 16 T.C. 854, 860, which is the same case, supra, affirmed on appeal by the 4th Circuit.

actment the rulings which had been made by the Courts as hereinabove indicated." Gotfredson v. Commissioner of Internal Revenue, 6 Cir., 217 F.2d 673, 676, certiorari denied 350 U.S. 846, 76 S.Ct. 46, 100 L.Ed. 753.

"Even before the 1951 amendment, courts and the Commissioner have recognized this." Estate of C. A. Smith, supra, at page 705 of 23 T.C.

"Secondly, the legislative history of the amendment unmistakenly demonstrates that Congress considered the amendment to be a codification of the *Albright* and *Bennett* decisions." McMurtry, 29 T.C. 1091, 1093, affirmed per curiam, 5 Cir., 262 F.2d 589.

See, also, McDonald v. Commissioner of Internal Revenue, 2 Cir., 214 F.2d 341, 343; Laflin v. United States, D.C.D.Neb., 100 F.Supp. 353, 360, appeal dismissed, 8 Cir., 194 F.2d 709.

The taxpayer, therefore, is not in a position to claim that the 1951 statute presented new elements which rendered his prior option selection meaningless and unfair. As the Tax Court said in Little, supra, pp. 158–9 of 34 T.C.:

"There is no reason to conclude that Andrew was forced to use the 'unit-livestock-price' method of inventorying his sheep and cattle. He had some choice in this matter when he undertook this business. * * * This Court is in no position to say in this case that the inventory method which Andrew chose and consistently followed and which the Commissioner has followed in computing the gain from the sale of these culled cattle was an improper method."

It is true that this taxpayer has been in the business of raising breeding cattle since a year or so prior to this court's Albright decision. Albright, however, was concerned with the sale of so-called culls and the application of the 1939 Code's § 117(j) thereto. As we have noted, I.T. 3666, which was issued in 1944, and thus well before the taxpayer's selection of the accrual-inventory method and of the unit-livestock-price evaluation system, clearly recognized that capital gains treatment was available for the disposition of breeding cattle if all other necessary elements were satisfied. We conclude that the taxpayer at the inception of his business was not denied the opportunity of making a considered and meaningful choice of available options.

2. The propriety of the taxpayer's attempt to recover his unit values. What we have just said on the first question is perhaps dispositive of the case. The second point, however, deserves comment.

■ The Commissioner has the power to prohibit a taxpayer's change of accounting method without the Commissioner's consent. Brown v. Helvering, 291 U.S. 193, 203, 54 S.Ct. 356, 78 L.Ed. 725; St. Paul Union Depot Co. v. Commissioner of Internal Rev., 8 Cir., 123 F.2d 235, 239; Advertisers Exchange Inc., 25 T.C. 1086, 1092–1093, affirmed per curiam, 2 Cir., 240 F.2d 958. The question then is whether this taxpayer has attempted to make a change in accounting method. Regs. § 1.446–1(e) (2) (i) describes a "change" to include one "in the overall method of accounting for gross income or deductions" and also one "in the treatment of a material item". Subparagraph (ii) sets forth examples, among which are "a change involving the method or basis used in the valuation of inventories" and "a change in the treatment of any other items of income or expense, where material". Although the taxpayer, after he had begun his amortization of yearling cattle inventory values, was still employing an overall accrual method, we conclude that he was attempting a change in the handling of a material item. Cattle raising was his business and cattle breeding was an important and material part of that business. The 5th Circuit has characterized this kind of thing in Carter, supra, when it said, at page 601 of 257 F.2d.:

"It therefore amounts simply to an effort by petitioner, in his desire to use his cost rather than inventory

as a basis, retroactively to change his method of accounting, which cannot be done."

Compare Frost, supra, at page 1120 of 28 T.C.

The taxpayer asserts that he is only correcting a compelled error which falls far short of qualifying as a change in his accounting system. He cites Beacon Publishing Co. v. Commissioner of Internal Rev., 10 Cir., 218 F.2d 697, 702; Wetherbee Electric Co. v. Jones, D.C. W.D.Okl., 73 F.Supp. 765, appeal dismissed by stipulation, 10 Cir., 164 F.2d 278; and O Liquidating Corp., T.C. Memo. 1960-29, Docket No. 69767, decided February 25, 1960, 1960 CCH T.C. Memo.Dec. 24,067(M), P-H T.C.Memo. Dec.Par. 60,029. We need not pass upon the question of the validity of error corrections without the Commissioner's consent. We need only reiterate, in response to the taxpayer's argument, that we agree with the 5th Circuit in Carter when it described their taxpayer's effort "to use his cost rather than inventory as a basis" as an attempt "to change his method of accounting". Here, correspondingly, is an attempt to accomplish, although over six years, a zero basis rather than inventory as a basis. This too we regard as an attempted change in the method of accounting.

The taxpayer suggests and has endeavored to demonstrate that in any event a request for permission to change this accounting feature would have been denied by the Commissioner. There is nothing here, however, to convince us that a denial would have been arbitrary. The applicable standard is whether the accounting clearly reflects income, §§ 446(b), 471. The Commissioner's requirement that the taxpayer continue to follow his existing method was within his administrative discretion; that discretion is "wide" and it is not in the province of this court "to weigh and determine the relative merits of systems of accounting". Brown v. Helvering, supra, at pages 203–205 of 291 U.S., at page 361 of 54 S.Ct.; Automobile Club of

Mich. v. Commissioner, 353 U.S. 180, 189–190, 77 S.Ct. 707, 1 L.Ed.2d 746.

Although one might usually assume that congressional intent, so far as relief to the farmer or rancher is concerned, is broad and liberal, we reach the conclusion here that the taxpayer cannot prevail on the issue before us. The judgment is therefore reversed and the case remanded to the district court for the entry of an appropriate judgment for the taxpayers on only the issue which was decided below in their favor and which is not questioned on this appeal.