OCTAVIO REYES GARCÍA, Plaintiff, Appellee, and Appellant, *v.* SECRETARY OF THE TREASURY, Defendant, Appellant, and Appellee.

Nos. 12886 and 12564.   Decided March 9, 1962.

*Félix Ochoteco* for appellee and appellant. *J. B. Fernández Badillo, Solicitor General of Puerto Rico,* and *Juan A. Faría, Assistant Solicitor General,* for appellant and appellee.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Dávila.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

By deed of May 6, 1949 executed before Notary Antonio Quirós Méndez, the taxpayer Octavio Reyes García acquired by purchase from the corporation Hernández Bros. & Co. eight rural farms devoted to the growing of sugar cane for a total price of $157,782.38, including the plantations existing thereon on February 16 of the same year—to which date the contract was expressly made retroactive—various buildings and some agricultural equipment. There was no exchange of money in the transaction. The price indicated was paid by the purchaser by assuming the payment of certain debts which the selling company had incurred.[1] During the execution of the contract the parties clearly stated, that from the selling price "fifty thousand dollars correspond to the farms themselves,[2] and one hundred and seven thousand

---

[1] The debts the payment of which was assumed were as follows:

| | |
|---|---|
| Central San Vicente, Inc. | $50,000.00 |
| Sociedad Agrícola Eugenio Pérez Claudio y Cía. | 26,217.25 |
| Carmelo, Eugenio and Ferdinand Pérez Martín | 24,200.55 |
| Puerto Rico Production Credit Association | 40,268.62 |
| Ochoa Fertilizer Corporation | 12,955.19 |
| Central San Vicente, Inc. (in regular account) | 4,140.57 |

During the year 1949 the purchaser paid the debts to Puerto Rico Production Credit and Ochoa Fertilizer Corporation, and he paid $20,000 to Central San Vicente, Inc. In 1950 the mortgage credits of Sociedad Agrícola Eugenio Pérez Claudio y Cía. and of the brothers Pérez Martín were paid. The remaining debt to Central San Vicente, Inc. was settled in 1951.

[2] It refers to the lands without the improvements nor the plantings.

seven hundred and eighty-two dollars and thirty-eight cents correspond to the plantations and the equipment..."

The evidence established in an indisputable way, and the trial court so determined, that the constructions and the equipment had a value of $5,000 and $2,000 respectively. The plantations were appraised, therefore, at $100,782.38. This was the amount which, as an element of cost, the taxpayer reported in his income-tax return for the calendar year 1949. In reviewing the income tax returns, the Secretary rejected that amount and only granted as initial cost, the sum of $31,756.26, that is, the amount that is shown in the accounting books of the vendor as invested to raise the plantation ($26,181.61) plus an estimated benefit derived by the vendor in said transaction ($5,574.65). The difference between the amount claimed ($100,782.38) and the amount granted ($31,756.26) that is, $69,026.12, prompted the adjustment in the taxable net income for the year 1949, and the subsequent determination of a deficiency. The same result was produced in the following year 1950, to which the taxpayer carried over the balance of the previous year's loss. Feeling aggrieved with the administrative determination, the taxpayer appealed to the Superior Court and challenged both deficiencies.

The corresponding hearing was held. Plaintiff introduced ample documentary evidence and the testimony of three witnesses to support his contention that the sum of $100,782.38 was deductible as part of the cost for producing the income represented by the conversion of the cane into sugar (1) because it was thus expressly agreed upon by the parties upon stating it explicitly in the deed of sale, and in the absence of a fraud charge, such an expression of the will must prevail; and (2) because, even disregarding the foregoing, the amount claimed was reasonable. The Secretary of the Treasury limited himself to introducing into evidence the original returns which had been filed by the taxpayer for

the years in controversy, the deficiency notices—which were admitted for the sole purpose of classifying the explanation of the altered items—and a report prepared by the Agricultural Experiment Station of the University of Puerto Rico which contains a chart showing the production costs of sugar cane in Puerto Rico during the grinding season 1945–46.[3]

After setting forth the theories of both parties, the trial court stated the following:

"In the light of the evidence at bar, neither party is entirely right. We cannot make a conclusion exclusively on the basis of the explanation and final analysis in deed No. 3 which although not expressed in said explanation, it could have been due to a question of registration for the purposes of the tariff. It must be viewed in the light of and together with other covenants and clauses of the deed itself, and also in the light of deed No. 14, in which the party which now sold to plaintiff acquired the property. The mortgages of $26,000 and $24,000 and interest thereon which plaintiff was bound by withholding it from the selling price, were originally a lien. But in addition, and while the farms were in the hands of Hernández Bros., the vendor constituted another mortgage in favor of Central San Vicente for $50,000 of which sum these farms guaranteed $30,000.

"Besides the fact mentioned in deed No. 14 that these farms were worth more than indicated therein, we can not believe that in normal circumstances they would give an $80,000 mortgage on property worth $50,000. On the other hand, it unquestionably appears that from the selling price, $40,268.82 constituted a preferred agricultural advance on the same crop, and it was so much so, that not until this credit was paid, the Central

---

[3] During the course of the trial, the Secretary tried to alter the grounds which he adduced in the notice of deficiency in order to consider the transaction effected as a disposition of capital assets, invoking therefor art. 76 of the Regulations of 1924. Such a move was overruled, and the complaint continued its procedure and was decided on the sole basis of establishing the amount of the deduction claimed. The appeal filed by the Secretary does not question the court's action. Respecting the propriety of and the effect as to the burden of proof upon adducing new grounds to sustain the deficiency in the judicial proceeding, see, *Ramón* v. *Secretary of the Treasury*, 84 P.R.R. 423 (1962).

should consider the canes delivered as belonging to the vendor Hernández Bros. and not to the purchaser. It is equally clear that the credit for $12,955.19 of Ochoa Fertilizer was an expense for the planting of the crop.

"These sums amount to $57,364.58 which subtracted from the total price of $157,782.38, leaves a difference of $100,417.80. If we eliminate the $417.80 interest on the mortgage, there would remain from the selling price the exact amount of $100,000 as the part which corresponds to the lands and its structures, which amount is more in harmony with other elements shown in the evidence which need not be pointed out, such as production cost per ton of cane, and a lease, and more in harmony with the fact that the property were acquired with encumbrances amounting to $80,000, that is, 4/5 of their value, and not in excess thereof.

"The system employed by the Secretary of considering the cost of the crop only on the basis of entries in the books of the vendor, and another formula which he employed to determine profit was erroneous and is not supported by the evidence. For the purposes of this controversy, the cost of the crop should be $57,364.58 and not $100,782.38 as used by the taxpayer nor $31,756.26, as used by the Department of the Treasury."

Both parties appealed from the judgment. The Secretary's appeal is limited to challenging the pronouncement which exempted the taxpayer from the payment of a 5% penalty over the deficiencies.

1. The evidence submitted reveals that the taxpayer has been engaged in agriculture since 1930 and that he has had experience in appraising sugar cane crops; that he renders his income tax returns on a cash basis; that he became interested in acquiring the agricultural business of the partnership Hernández Bros. after the grinding season for the year 1949 was under way; that he was interested in a "new" farm, recently dismantled, and of rolling lands; that on March 26, he made an appraisal of the crop pending in the farms of said partnership known as Río Lajas enterprise, and to that effect he prepared an estimate per piece of plantation, type of crop—spring cane (52.25 cuerdas), fall planting

(60.66 cuerdas) and sprouts (215.50 cuerdas)—and tonnage per cuerda, which amounted to a total of 13,419 tons; that since the cane involved did not need additional planting expenses, because the plantations were "closed" and in the process of being cut, he appraised them at the rate of $7.50 per ton, including federal compensation of benefit payments, because it was so discussed and finally agreed upon with the representative of the vendor partnership; that this estimate valued the crop at $100,652.50; that he appraised the pending crop on the basis of said estimate of the standing cane, but not strictly on the cost of cultivating the plantation; that the crop produced 13,473.61 tons, of which 12,257.61 tons were delivered for grinding, and about 1,216 tons were destined for seed; that the ground crop produced $124,096.04, including the benefit payment and the compensation which the central grants for hauling and delivery;[4] that after the cutting of the cane, the stumps were cultivated in 328 cuerdas, and that these stumps could be valued at an average of $12 per cuerda; that the agricultural unit acquired was later leased to his son for a rental of $8,000 annually.

The deeds admitted in evidence show that the vendor partnership had acquired the farms the preceding year, 1948, at a price of $50,000, which payment was totally deferred and guaranteed with mortgage; that he had also acquired the plantation existing in the farm in January of that year—at cutting time—for $70,000; and that afterwards new plantings were made—he undoubtedly refers to the 60.66 cuerdas of fall planting canes.

We have repeatedly held that the administrative determinations of the Secretary of the Treasury are clothed with a presumption of correctness which is overcome by credible and reasonable evidence sustaining the taxpayer's contentions, *Vilanova v. Sec. of the Treasury*, 83 P.R.R. 72

---

[4] We have been unable to determine whether or not the payments for the liquidation of surplus sugar and molasses are included in this sum.

(1961); *Carrión* v. *Treasurer of P. R.*, 79 P.R.R. 350, 360–61 (1956); *Vilanova* v. *Sec. of the Treasury*, 78 P.R.R. 768 (1955); *Cía. Marítima, etc.,* v. *Descartes, Treas.*, 78 P.R.R. 560 (1955); and that even though this evidence "does not have to be extraordinarily persuasive and authentic or clear, strong and convincing, at least it should be within the degree and measure of persuasion required in all other civil cases," as we stated in *Collazo* v. *Sec. of the Treasury*, 82 P.R.R. 629, 635 (1961). In the case at bar the taxpayer contested successfully the administrative determination, and it was so decided by the trial court upon concluding that "the system employed by the Secretary of considering the cost of the crop only on the basis of entries in the books of the vendor, and another formula which he employed to determine profit was erroneous and is not supported by the evidence." The taxpayer's evidence having been produced, it was incumbent on the Secretary to introduce evidence to support his contentions, and the evidence which was produced herein amounted to "remaining idle and relying on the presumption of correctness," *Carrión* v. *Treasurer of P. R.*, 79 P.R.R. 350, 363 (1956). All that the trial court had to consider was whether the evidence presented by the taxpayer which was not controverted in any way whatsoever, was reliable and whether or not it reasonably sustained his contention. Certainly it is not obligatory to believe or accept the uncontested testimony of the interested party when it is highly improbable, *Snyder* v. *Commissioner*, 288 F.2d 36 (C.A. 7, 1961); *Clark* v. *Commissioner*, 266 F.2d 698 (C.A. 9, 1959); *Pool* v. *Commissioner*, 251 F.2d 233 (C.A. 9, 1957); *Winters* v. *Dallman*, 238 F.2d 912 (C.A. 7, 1956), or obviously unreasonable, *Factor* v. *Commissioner*, 281 F.2d 100 (C.A. 9, 1960); *Payne* v. *Commissioner*, 268 F.2d 617 (C.A. 5, 1959); *Carter* v. *Commissioner*, 257 F.2d 595 (C.A. 5, 1958); *cf. Collazo* v. *Sec. of the Treasury, supra.* There is nothing in the case at bar which specifically shows that credence was not given to

the taxpayer's evidence, which when weighed as a whole, is sufficiently convincing to sustain the position he assumed in the suit. Hence, in order to determine definitively the only question raised—the initial cost of the cane plantation— one can not fail to consider the evidence introduced, and which established the true value agreed upon by the parties, and substitute it by a different criterion, that is, the re-production cost of the plantation.[5]

We believe that the taxpayer satisfactorily overcame the presumption of correctness of the administrative deter-mination, not only as to his obligation to offer credible and reasonable evidence to support his contention, but also as to its effect in persuading the court. *Vilanova* v. *Secretary of the Treasury*, 83 P.R.R. 72 (1961); *Collazo* v. *Secretary of the Treasury*, 82 P.R.R. 629 (1961); *Carrión* v. *Treasurer of P. R.*, 79 P.R.R. 350, 360–61 (1956). Having concluded that the Secretary's determination was erroneous, we now

---

[5] In the course of the trial, the court correctly stated the norm to be applied, as it appears from the statements which we copy below, but ap-parently it became confused because it understood that there was no evidence of what was paid for the plantations, and it resorted then to the alternative method of the reproduction cost, the use of which could be fully justified in the absense of the evidence on the cost agreed upon by the parties:

"... What something costs me, that is its cost, even if it is an inflated cost. One must admit it. I buy a house for $10,000 and, because I was confused or for any other reason, if I then sell it, if I make a capital gain, that is my cost, even if it appears that nobody, ever, got more than $6,000 for it. But, since I paid $10,000 and that is free of fraud, that is my cost. The apparent problem in this case is that the deed does not state that X amount was paid for the plantations. There would be no litigation. I would need proof that it was a deal for the purpose of defrauding. If I state that X amount was paid for the plantations, that would be the cost. Then, we have to go by other routes, to determine a cost. And when we must take those other routes, then I tell you we are treading on the limited path of the deductions where we must tread with a restrictive sense, and as my colleague knows, that is the law. If in this alternative way, I must determine the cost of these plantations, I shall have to do it taking into consideration what was really and actually invested to grind that cane which later produced that income."

turn to determine the basis for the correct computation of the tax.[6]

■ The starting point must necessarily be the price agreed upon by the parties in the deed of sale for the planting of existing canes, that is, the sum of $100,782.38. Even the slightest reflection will show that this is not an irreducible figure, since the evidence presented by the taxpayer himself gives us the information that will permit us to fix in a sufficiently adequate and reliable manner the true cost of the canes which produced the income of $124,096.04 when converted into sugar. The specified price of $100,782.38 includes the cane delivered to the mills and ground by them, an item of $417.80 paid for interest on the mortgage loans, and which unquestionably does not constitute an expense of the plantation, as well as the value of the stumps which were cultivated in the following years and the cost of the 1,216 tons of cane which were used by the colono for seed. We must necessarily subtract the value of the stumps—328 cuer-

---

[6] In Puerto Rico, under the legislation of 1924 as well as that of 1954, the benefit obtained in the disposal of pending crops is considered as ordinary income. Articles 76, 110 and 121 of the Regulations of 1924 (English ed.), pp. 53, 73 and 79. The same solution prevailed in federal jurisdiction until the enactment in 1951 of an amendment to § 117(j)(1) of the Internal Revenue Act of 1939, *Watson* v. *Commissioner*, 345 U.S. 544 (1953), 197 F.2d 56 (C.A. 9, 1952); *cf. McCoy* v. *Commissioner*, 192 F.2d 486 (C.A. 10, 1951), by which the benefit of declaring the gains obtained as if it were a disposition of capital assets, was granted, under certain conditions, in cases of pending crops. See Dakin, *The Capital Gains Treasure Chest: Rational Extension or Expedient Distortion*, 14 La. L. Rev. 505 (1959); *Farmers and The Federal Income Tax*, 19 U. Ch. L. Rev. 522, 532–33 (1952); *Ordinary Income or Capital Gain in the Sale of an Orange Grove*, 4 Miami L.Q. 145 (1950). Upon adopting locally in 1954 the provisions of the Federal Act of 1939, those sections were omitted which permit a special relief to certain types of taxpayers—sales of forests, cattle, and pending crops. See § 117(g) of the Income Tax Act of 1954, 13 L.P.R.A. § 3117, and § 117(j)-1 of the Regulations, 13 R.&R.P.R. § 3117-1. In general, see 3B Mertens, Law of Federal Income Taxation (rev. Zimmet and Weiss), §§ 22.123, 22.131 and vol. 3A, §§ 21.255 and 21.256. It befits the Legislative Assembly to determine whether or not the situation of the Puerto Rican cattle raising and agricultural industries require the stimulus which such a measure represents.

das at $12 per cuerda—amounting to $3,936, and the cost of the 1,216 tons of cane used for seed, which in our opinion, amounted to $8,706.56.[7] The cost of the 12,257.61 tons delivered to the central was $87,722.02.[8]

2. The Secretary of the Treasury appealed from the judgment as to the pronouncement of the judge who later intervened in the incident of approval of estimates excluding from the deficiency the amount of the penalty provided by § 58 of the Income Tax Act of 1924, 13 L.P.R.A. § 776, in the case of negligence or intentional ignorance of the rules and regulations, but without intent of fraud. *P. R. Telephone Co.* v. *Secretary of the Treasury*, 79 P.R.R. 845 (1957); *Quiñones* v. *Secretary of the Treasury*, 77 P.R.R. 100 (1954). The Secretary of the Treasury argues that in the complaint filed by the taxpayer, the imposition of the penalty contained in the notice of deficiency was not expressly

---

[7] We have computed this amount in the following manner:

| | |
|---|---:|
| Price stated in the deed | $100,782.38 |
| Less: Value of the stumps and interest | 4,353.80 |
| | |
| Cost of 13,473.61 harvested tons | $96,428.58 |
| Average cost per ton | 7.16 |
| 1,216 tons of cane at the rate of $7.16 per ton | $8,706.56 |

[8] Even if we would have accepted the formula elaborated by the trial court, that is, the cost of reproduction of the plantation as represented by the various loan and cultivation expenses payment of which the purchaser assumed, and which gave a result of $57,364.58, we would always have to add to it the estimate of the federal benefit payments, since in agreement with the contradicted evidence, the parties included it upon considering and fixing the price of the plantation. Computed at the rate of $1.70 per ton, this payment would amount to $20,847.93, considering that 12,257.61 tons were delivered. The cost would rise to $78,212.51. The difference between this amount and the one we have fixed as the cost is only of approximately $9,500.

From the estimate of the canes' appraisal prepared by the plaintiff it appears that the crop was assessed at $7.50 per ton, which covered $5.80 of cultivation expenses until the plantation was "closed", according to the repeated testimony, and $1.70 for federal benefit payment. The difference between the estimate of production made by the taxpayer—13,419 tons—and the volume which was actually produced—13,473.61 tons—was slight.

contested. In *Buscaglia, Treas.* v. *Tax Court; Arcelay de la Rosa, Intervener*, 67 P.R.R. 12, 15 (1947) we stated that "The hearing on the computation, if any takes place, should be confined to a mathematical dispute. The parties must be made to understand that they cannot litigate piecemeal. They must present their entire case originally. The hearing on the computation must be confined to that issue alone, and cannot be utilized as a device to relitigate issues which were or should have been presented to the Tax Court at the hearing on the merits. *González Padín Co., Inc.* v. *Tax Court*, 66 P.R.R. 909. If either party wishes at that time to raise an issue which should have been litigated in the proceeding itself, the Tax Court should refuse to entertain it, except pursuant to a motion to vacate the decision and to hold a new hearing with suitable amendment of the pleadings. And the Tax Court should grant such a motion rarely and only for the most substantial reasons." In *Community of the Heirs of Fajardo* v. *Tax Court*, 73 P.R.R. 499, 511–12 (1952) we added that when the trial court does go into the merits of new substantive questions when a computation is submitted, we have in some cases refused to reverse on that ground, provided both parties had their day in court. In *Central Roig Refining Co.* v. *Secretary of the Treasury*, 83 P.R.R. 871 (1961), we permitted, under the circumstances of the case a new question to be raised on the incident of approval of estimates, and for that purpose we considered, among other factors, that the allegation raised did not require the holding of a trial to argue questions of fact, and that, in any case, the motion to challenge the estimates, could be considered as a supplementary allegation, which in no way prejudiced the Secretary since it concerned a question purely of law.

The allegations of the complaint having been interpreted in the most liberal manner, it may be sustained that plaintiff's allegation that "he owes nothing to defend-

586

ant by way of income tax" for the years in controversy, suf-·ficiently raised the question of whether the imposition of the penalty was proper. Likewise, all the circumstances of the case having been considered, we are not convinced that the taxpayer incurred in negligence or intentional ignorance of the regulations. *P. R. Telephone Co.* v. *Secretary of the Treasury, supra,* pp. 882–83; *cf. Freeman* v. *Noguera, Sec. of the Treas.,* 82 P.R.R. 298, 309–10 (1961); *Hatfried* v. *Commissioner,* 162 F.2d 628 (C.A. 3, 1947). The error as-·signed in the Secretary's appeal was not committed.

The judgment will be modified so as to fix the cost of the cane plantation acquired by the taxpayer in the amount of $87,722.02, instead of $57,364.58 as the San Juan Part of the Superior Court determined, and the case will be remanded for the filing and approval of new estimates in harmony with this determination.[9]

---

[9] The taxpayer declared in his return a net loss of $30,600.42 for the year 1949, which shall be reduced to $17,540.06. This is the loss which may be carried over to the following year 1950. The taxpayer having had a taxable net income of $15,254.54 in 1950, this one shall be readjusted in conformity therewith and a raise in said net income is determined, which for the purposes of taxation is fixed at $28,314.94