**PETERSON PRODUCE COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 1621.**

United States District Court
W. D. Arkansas,
Fort Smith Division.
May 23, 1962.

Little & Enfield, Bentonville, Ark., for plaintiff.

George A. Hrdlicka, Atty., Dept. of Justice, Washington, D. C., Charles M. Conway, U. S. Atty., Robert E. Johnson, Asst. U. S. Atty., Ft. Smith, Ark., for defendant.

JOHN E. MILLER, Chief Judge.

### STATEMENT

The plaintiff, Peterson Produce Company, filed its complaint on August 17, 1961, seeking to recover the sum of $110,410.15 income tax paid for the taxable year ending August 31, 1956, by virtue of a net operating loss carryback to 1956 from the taxable year ending March 31, 1959. The plaintiff alleged that the disallowance of the said net operating loss carryback to the taxable year ending August 31, 1956, by the Commissioner of Internal Revenue and the assertion of a tax deficiency for the taxable year ending March 31, 1959, were erroneous in that the defendant disallowed the use of a cash method of accounting in the plaintiff's broiler farming department, which method disclosed a net operating loss.

In its answer filed October 23, 1961, the defendant denied that the disallowance by the Commissioner of Internal Revenue of plaintiff's use of the cash method of accounting in its broiler farming department was erroneous for the reason that the broiler farming operations did not constitute such a new and separate business that entitled the plaintiff to depart from its accrual method of accounting, which it was accustomed to use to reflect the income of all its previous operations. Defendant further alleged that if plaintiff were to use the accrual method of accounting to reflect the operations of its broiler farming department for the taxable year ending March 31, 1959, in harmony with the feed and hatchery departments of plaintiff, which also used the accrual method of accounting to reflect its operations for the same taxable year, that the cost of broiler flocks on hand at the end of the year in question should be included in the plaintiff's closing inventory, which determination would result in the disallowance of a net operating loss carryback from the said year to the taxable year ending August 31, 1956, and would further result in an assertion of an income tax deficiency for the taxable year in question.

The case was tried to the court on February 6 and 7, 1962, and at the conclusion of the presentation of the testimony, it was taken under advisement by the court and the parties were requested to submit briefs in support of their respective contentions. The briefs have now been submitted and the court, having considered the pleadings, the testimony adduced at the trial, the exhibits, and the briefs of the counsel, now makes and files herein its findings of fact and conclusions of law, separately stated.

### FINDINGS OF FACT

1.

The plaintiff is a corporation duly organized and existing under the laws of the State of Arkansas with its principal place of business at Decatur in Benton County, Arkansas.

## 2.

Peterson Produce Company paid corporation income taxes for the taxable year ending August 31, 1956, amounting to $129,926.02. On or about June 14, 1959, plaintiff filed its federal income tax return for its taxable year ending March 31, 1959, and reported a net operating loss of $212,327.22. On or about June 3, 1959, the plaintiff filed with the District Director its claim for refund of taxes for the taxable year ending August 31, 1956, in the amount of $110,410.15, based on the net operating loss from the taxable year ending March 31, 1959, carried back to the taxable year ending August 31, 1956, which refund was paid to the plaintiff.

During 1960, the District Director examined plaintiff's books and records, and after said examination the District Director disallowed the net operating loss carried back to the taxable year ending August 31, 1956, and asserted an income tax deficiency of the $110,410.15 refund paid to the plaintiff along with a further income tax deficiency of $23,183.89 for the taxable year ending March 31, 1959, all of which was paid to the defendant by June 5, 1961.

## 3.

Plaintiff was incorporated during the year of 1947. Prior to that time plaintiff was a sole proprietorship owned and operated by Lloyd Peterson, which dealt primarily in the sale of feed for livestock and poultry. During the ten years prior to 1947, Mr. Peterson also sold on a limited scale baby chicks to growers. Subsequent to the date of incorporation, plaintiff not only sold feed to local chicken growers, but also entered the hatchery business. The breeding of chickens had been carried on at one of plaintiff's own farms since 1946, and by 1952 the plaintiff had on hand what is called a laying flock for purposes of producing its own eggs to be incubated. Since 1952 plaintiff's feed and hatchery operations have increased considerably.

On September 1, 1958, plaintiff created a broiler farming division, which made a total of three divisions comprising the plaintiff corporation, the original two being the feed and hatchery divisions, or, as they are sometimes referred to, "departments."

## 4.

The effect of the creation of this new department by the plaintiff has been characterized as being both external and internal. The external effect is reflected in the plaintiff's dealings with the various chicken growers with whom it contracts. Prior to September 1, 1958, the plaintiff had two basic forms of growing contracts, which it utilized in the broiler farming operations carried on by local growers. One form of contract was called a "profit sharing" type of arrangement whereby the plaintiff guaranteed the grower a minimum price per pound per chicken marketed plus a conversion incentive per head, if any, and any profits above this price were shared equally by both parties. The essential provisions of this agreement (DX B), entitled "Contract for Raising Poultry," are as follows:

"The Party of the First Part [Peterson] agrees to sell to the Party of the Second Part [Grower], chicks, feed, litter, fuel, and medication required to raise the poultry and pay the Party of the Second Part on the following basis:

"The Party of the First Part agrees to pay the Party of the Second Part two cents per pound for all poultry sold, plus one-half the profit, when the conversion is under 42 pounds. Also, the Party of the First Part agrees to pay the Party of the Second Part conversion incentive as follows:

42 lbs. meat per 100# feed —grower will receive 2¢ per lb. plus ¼¢ per bird.

43 lbs. meat per 100# feed —grower will receive 2¢ per lb. plus ½¢ per bird.

44 lbs. meat per 100# feed —grower will receive 2¢ per lb. plus ¾¢ per bird.

45 lbs. meat per 100# feed —grower will receive 2¢ per lb. plus 1¢ per bird.

46 lbs. meat per 100# feed —grower will receive 2¢ per lb. plus 1¼¢ per bird.

47 lbs. meat per 100# feed —grower will receive 2¢ per lb. plus 1½¢ per bird.

48 lbs. meat per 100# feed —grower will receive 2¢ per lb. plus 1¾¢ per bird.

49 lbs. meat per 100# feed —grower will receive 2¢ per lb. plus 2¢ per bird.

50 lbs. meat per 100# feed —grower will receive 2¢ per lb. plus 2¼¢ per bird.

———◆———

"The amount paid the Party of the Second Part per pound plus the conversion incentive per head, if any, will be charged to the Party of the Second Part's account. All profits above that will be divided equal.

"The Party of the Second Part agrees to furnish one square foot for each bird, one stove for each 500 birds, one 3-gallon waterer for each 125 chicks, or one 4-foot water trough for each 250 chicks (or the equivalent with a combination of the two), and three 4 or 5-foot feeders with reels for each 100 chicks.

"Fuel cost in the excess of 2¢ per head will be paid by the Party of the Second Part.

"It is further agreed that the Party of the Second Part will contact the Party of the First Part prior to the sale of the poultry and get their consent to the sale of the same."

Another form of contract was called a "conversion" contract, whereby the plaintiff agreed to pay the grower a price per bird sold based on a sliding scale which was governed by the weight of meat produced per 100 lbs. of feed consumed. The essential provisions of this second type of agreement (DX A), also entitled "Contract for Raising Poultry," are as follows:

"The Party of the First Part [Peterson] agrees to sell to the Party of the Second part [grower], chicks, feed, litter, fuel and medication required to raise the poultry, and pay the Party of the Second Part on the following conversion basis:

| 40 | Conversion– | Grower will receive 5¢ | per bird sold. |
| 39½ | " | – Grower will receive 4½¢ | " " " |
| 39 | " | – Grower will receive 4¢ | " " " |
| 38½ | " | – Grower will receive 3½¢ | " " " |
| 38 | " | – Grower will receive 3¢ | " " " |
| 37½ | " | – Grower will receive 2½¢ | " " " |
| 37 | " | – Grower will receive 2¢ | " " " |
| 36½ | " | – Grower will receive 1½¢ | " " " |
| 36 | " | – Grower will receive 1¢ | " " " |

"The Grower will also receive all of the profit after the conversion guarantee has been applied against the account.

"If a loss occurs, it will be the obligation of the Party of the First Part.

"The Party of the Second Part agrees to furnish one square foot for each bird, one stove for each 500 chicks, one 3-gallon waterer for each 125 chicks or one 4-foot water trough for each 250 chicks (or the equivalent with a combination of the two), and three 4 or 5-foot feeders with reels for each 100 chicks.

"Fuel cost in the excess of 2¢ per head will be paid by the Party of the Second Part.

"It is further agreed that the Party of the Second Part will contact the Party of the First Part prior to the sale of the poultry and get their consent to the sale of the same."

The common denominator for both these arrangements was that the parties entered into a credit type arrangement in that the plaintiff sold feed, chicks, and other necessary medicines and supplies to the grower on what usually amounted to a credit basis, the plaintiff usually taking a chattel mortgage on the flock as security. When the chickens were marketed, the check in payment was either made out to the grower or jointly to the grower and the plaintiff, but in any case the contracts provided that the grower first was to settle his account with the plaintiff before being paid. During this time the plaintiff had no direct control over the growing of the flocks, even though, acting through its field men, it could assert a certain persuasive authority over the care and growing of the chickens, as well as through the profit sharing and efficiency incentive provisions of the above mentioned contracts.

During the period immediately prior to September 1, 1958, plaintiff sought a new form of contractual arrangement with its growers due to the mutual dissatisfaction of the parties manifested by the absence of profits to be shared by the growers and the absence of opportunity for quality control by the plaintiff over the chickens to be marketed. At all times before and after September 1, 1958, the underlying cause of the mutual dissatisfaction was the chicken market, which can best be termed as uncertain and highly speculative. Illustrative evidence of the fluctuations in the chicken market, and therefore in the broiler farming business itself, was introduced as PX 1, which is a graph showing the monthly price per pound of chickens from major broiler producing areas for the years 1958 through 1961. The price spread ranged from a high of 22¢ per lb. in March and June, 1958, to a low of 10½¢ in September, 1961. This chart further shows many fluctuations during the intervening period.

As a result of these factors, plaintiff set up the new broiler farming division as heretofore stated on September 1, 1958, and simultaneously introduced a new form of contract to be entered into with the growers. The basic characteristic of this new arrangement is that plaintiff never relinquishes its title to the chickens and retains complete control over their care, feeding and the time for marketing them. Generally, the plaintiff furnishes the chicks and all necessary feed and medicine; and the plaintiff's field agents, who formerly could act in an advisory capacity only, now have near absolute authority to control the growing conditions and marketing of the chickens.

The essential provisions of this newer form of contract (PX 2), entitled "Lease Agreement," are as follows:

"1.  Peterson agrees to lease from Property Owner the following described chicken houses, located on the farm of Property Owner, in (or near)

"2.  The chickens, feed, medication, fuel, litter, and so forth, placed in these houses will be

under the supervision and control of Peterson at all times.

"3. The Property Owner will furnish the labor, water, electricity, to raise the chickens, and will prepare the house to accommodate each new bunch, but will exercise no other control over them.

"4. The rental fee for the above described chicken houses will be paid upon the sale of each bunch of chickens at the rate of one cent (1¢) per pound of live poultry sold.

"5. In consideration for labor performed by the Property Owner, Peterson will pay, upon the sale of each bunch of chickens, one cent (1¢) per pound of live poultry sold.

"6. Poultry not accepted by Government Inspectors is not covered by this contract.

"7. This lease agreement is for a period of one year, ——————————, except for the following stipulation: Peterson may terminate this agreement at the end of any growing period upon the failure of the Property Owner to perform such labor and management as is required by Peterson, or to maintain such standards as Peterson requires."

Since 1958 there has been a limited use of a contractual arrangement between the plaintiff and those growers who wished to continue the profit-sharing plan which had been utilized in previous years whereby the plaintiff, upon sale of the poultry, would pay the grower two cents a pound plus a one-half share of the profits that remained after deduction of the cost of chickens, feed and other necessities supplied by the plaintiff. The essential provisions of this contract (DX D), entitled "Poultry Growing Agreement," are as follows:

"Peterson agrees to furnish as its part of this contract, chicks, litter, feed, fuel, and medication plus electricity at the rate of $1.00 per thousand birds required to raise the poultry, and in addition, after the poultry is sold agrees to pay the Grower, as compensation for raising Peterson's poultry, the following:

"1. Peterson agrees to lease the chicken houses of the Grower for a period of one year for which he will pay the Grower 1¢ per pound of live poultry sold as rental.

"2. Peterson will pay the Grower 1¢ per pound of live poultry sold for his labor in raising the poultry.

"3. Upon the sale of the poultry, Peterson will deduct the retail price of chicks, litter, feed, fuel, medication, money paid on electricity, plus money paid for lease of chicken houses and for labor. If there remains a profit after said deductions, Peterson and Grower will share it equally.

"Poultry not accepted by Government inspectors is not covered by this contract."

Thus, what could be best characterized as a debtor-creditor relationship that existed prior to September 1, 1958, had now become what more nearly could be described as a master-servant relationship. In any event, the growing and marketing of the chickens has generally amounted to a joint enterprise all along, in that the combined efforts of the plaintiff and grower are necessary to produce a marketable fowl under any arrangement.

5.

The greatest internal change wrought by the creation of the new division is manifested in the means of accounting used by the plaintiff in the over-all operations of its several divisions and the inter-relationship of their operations. Prior to September 1, 1958, the income derived from plaintiff's over-all operations was reflected by the accrual method of accounting, since the bulk of its sales

of feed and chicks was on a credit basis. Subsequent to September 1, 1958, the only credit extended to chicken growers was to a small minority who chose to raise the chickens on their own and as-sume the risk of an uncertain and fluctu-ating market. In the majority of cases the plaintiff had the chickens raised and marketed them in its own name for cash through the operation of its broiler divi-sion.

The feed and hatchery divisions con-tinued to use the accrual method of ac-counting since they still were selling feed and chicks to the public at large on a limited basis. The bulk of their output, however, was transferred on their books at cost to the broiler division as accounts receivable. The broiler divi-sion in turn set up its accounting system on a cash method by which it made ap-propriate entries on its books in payment for the feed and chicks that were "sold" by the other two divisions to the broiler farming division. When the chickens were sold on the market, the proceeds were entered on the cash account. At the close of the taxable year the chickens that were in the process of growing to a market size were deducted as a cost item, which figure was derived from the total of the initial cost of the day-old chicks, plus the amount of feed and medi-cines that had been consumed by them up to that time. Each department kept its own journal and at the end of each month the journal entries, under an iden-tifying account number, were posted to the single general ledger, which reflected the financial activities of the plaintiff in general. The plaintiff has continued to maintain a single bank account. The ad-ministrative costs of the plaintiff, which consisted mainly of the salaries of its officers and the expenses attributable to its buildings and major items of equip-ment, were borne by the three divisions on a pro rata basis. For tax purposes there was a separate accounting of profit and loss for each of the plaintiff's divi-sions as if they were separate economic units.

**6.**

As heretofore referred to in the state-ment of the case, the plaintiff has sued to recover $110,410.15, but during the trial, counsel for the respective parties stipulated that since June 3, 1959, the date plaintiff filed its claim for refund with the District Director, it has ap-peared that certain adjustments should be made of the amount of the claim, and that if the court held that the plaintiff was entitled to recover, that they should be able to stipulate the amount of the recovery in order that a judgment for the plaintiff for the correct amount might be entered.

## DISCUSSION

The main controversy between the par-ties is centered around the method of accounting used to reflect the income of the broiler farming division of the plain-tiff. The plaintiff contends that this division comprises a new and separate farming enterprise, and since the vast majority of the sales of marketable chick-ens by this division are on a cash basis, that before the chickens are marketable, they must be carried as cost items with no market value at all, and that the cash accounting system is the only real-istic method that can be used to show profit and loss of this particular division and in turn of the plaintiff corporation itself. As for the other divisions, their sales to the public at large (although they are far less than their sales of chickens and feed to the broiler division) are on a credit basis. Therefore, an ac-crual method is justified in the other two divisions for those reasons besides the fact that the accrual method has been traditionally used by the plaintiff in tax-able years previous to the year beginning September 1, 1958.

On the other hand, the defendant con-tends that the broiler farming division is not a new and separate business since it is carrying on substantially the same activity that the plaintiff engaged in prior to September 1, 1958, and that in its present business activity it is an op-

eration fully integrated with the operations of the other two divisions, which supply the bulk of its requirements of feed and baby chicks. Defendant further contends that since the broiler farming division was not a new and separate division, that it was necessary for the plaintiff to obtain permission of the Commissioner of Internal Revenue in order to introduce a different method of accounting for the new division, and the Commissioner of Internal Revenue was justified in disallowing the use of the cash method of accounting on the basis that any accounting method which carried the inventory of pre-marketable chicks as a cost factor rather than an income-producing factor would not clearly reflect plaintiff's income for the taxable year in question.

Therefore, the main issue in the present case is whether the Commissioner's disapproval of the taxpayer's attempt to report its broiler division income on the cash method of accounting while it continued to report the income from other divisions of its business on the accrual method, and his consequent determination that the taxpayer must use the accrual method consistently with respect to all of its business income for the fiscal year in question was fully justified.

The first question going to the justification of the Commissioner's decision to disallow is whether it was incumbent upon the plaintiff to obtain the permission of the Commissioner before making the change in its accounting methods.

The controlling statute, 26 U.S.C. § 446, sets out the accounting methods available to the taxpayer, as follows:

"(a) General rule.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

"(b) Exceptions.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

"(c) Permissible methods.—Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting—

"(1) the cash receipts and disbursements method;

"(2) an accrual method;

"(3) any other method permitted by this chapter; or

"(4) any combination of the foregoing methods permitted under regulations prescribed by the Secretary or his delegate.

"(d) Taxpayer engaged in more than one business.—A taxpayer engaged in more than one trade or business may, in computing taxable income, use a different method of accounting for each trade or business.

"(e) Requirement respecting change of accounting methods.—Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary or his delegate."

The supporting regulations are found in 26 C.F.R., Sec. 1.446–1, which provide, inter alia:

"(e) Requirement respecting the adoption or change of accounting method.

\* \* \* \* \* \*

"(2) (i) Except as otherwise expressly provided in chapter 1 of the Code and the regulations thereunder, a taxpayer who changes the method of accounting employed in keeping his books shall, before computing his income upon such new method for

purposes of taxation, secure the consent of the Commissioner. A change in the method of accounting includes a change in the over-all method of accounting for gross income or deductions, or a change in the treatment of a material item. Consent must be secured whether or not a taxpayer regards the methods from which he desires to change to be proper. Thus, a taxpayer may not compute this taxable income under a method of accounting different from that previously used by him unless such consent is secured.

"(ii) Examples of changes requiring consent are: A change from the cash receipts and disbursements method to an accrual method, or vice versa; a change involving the method or basis used in the valuation of inventories (see sections 471 and 472 and the regulations thereunder); * * *."

The Court of Appeals for the Eighth Circuit has stood foursquare behind these regulations, as indicated by its decision in the case of United States v. Ekberg, 291 F.2d 913 (1961), in which the court stated at page 924:

"The Commissioner has the power to prohibit a taxpayer's change of accounting method without the Commissioner's consent. Brown v. Helvering, 291 U.S. 193, 203, 54 S.Ct. 356, 78 L.Ed. 725; St. Paul Union Depot Co. v. Commissioner of Internal Rev., 8 Cir., 123 F.2d 235, 239; Advertisers Exchange Inc., 25 T.C. 1086, 1092–1093, affirmed per curiam, 2 Cir., 240 F.2d 958. The question then is whether this taxpayer has attempted to make a change in accounting method. Regs. § 1.446-1(e) (2) (i) describes a 'change' to include one 'in the overall method of accounting for gross income or deductions' and also one 'in the treatment of a material item'. Subparagraph (ii) sets forth examples, among which are 'a change involving the method or basis used in the valuation of inventories' and

'a change in the treatment of any other items of income or expense, where material'."

See, also, Carter v. Commissioner of Internal Revenue, 257 F.2d 595 (5 Cir., 1958), in which the court stated at page 600:

"* * * It is a long established rule of tax procedure that an accounting method once adopted may not be varied or departed from at will by the taxpayer. No injury results generally to the taxpayer. Taxpayers are permitted considerable choice in their selection of a method of accounting, and so long as the available choices permit them to use a method that at once reflects true income and leaves available to them the benefits of all special treatment afforded by the law, there can generally be no criticism of the requirement that they stick to the accounting method chosen rather than change to a different recognized one or some hybrid method."

Thus the law is clear that once a taxpayer elects an accounting method for the conduct of its business which is approved by the above statutes and regulations, then it must continue to employ the same method in the same business until the Commissioner's permission to change the method is obtained.

Since the facts are uncontroverted that the plaintiff traditionally used an accrual type of accounting in the departments of its business prior to September 1, 1958, and instituted a hybrid system after September 1, 1958, whereby the accrual method was retained in the original department and the newly created broiler division began to use a cash system of accounting without the permission of the Commissioner, the next logical question is whether the plaintiff's broiler division, even if it constituted a "new" business, was a separate and distinct business within the purview of the applicable Treasury regulations so as to justify the use of a different accounting method with respect thereto.

The plaintiff does not deny the authority of the Commissioner as the court has heretofore set out, but the plaintiff contends that such authority does not prevent the institution of a different accounting method in its newly created broiler division, which division qualifies as a separate and distinct farming business.

In support of this contention plaintiff cites the case of United States v. Chemell (5 Cir., 1957), 243 F.2d 944, in which the court held an almost identical feed, hatchery and broiler operation to be a farming rather than an industrial operation, thus allowing the taxpayer to use the cash method of accounting and to disregard the livestock as inventory items. While the court agrees with the Fifth Circuit's designation of a feed, hatchery and broiler operation as a farming enterprise, it must be pointed out that in the cited case the taxpayer was not seeking a change in method of accounting once having elected the cash method, and furthermore the taxpayer maintained the same method of accounting in all of its departments.

Granted that the plaintiff has been engaged in the farming operation, it is still faced with the question of whether its broiler farming division was such a new, separate and distinct operation that the plaintiff could elect to use a cash method of accounting with respect to the broiler farming operation while retaining the traditional accrual method of accounting for its feed and hatchery divisions.

It is true that 26 C.F.R., Sec. 1.471–6, allows the farmer the discretion of using the cash or accrual method of accounting and to disregard his livestock as inventory if he wishes. However, the regulation goes on to state:

"It is optional with the taxpayer which of these methods of accounting is used but, having elected one method, the option so exercised will be binding upon the taxpayer for the year for which the option is exercised and for subsequent years unless another method is authorized by the Commissioner as provided in paragraph (e) of Sec. 1.446–1."

■ Thus, it is immaterial whether a taxpayer is a farmer or not, for once he elects a method of accounting, he must abide by it until he either obtains permission from the Commissioner to change or enters into a new, separate and distinct business.

■ The plaintiff argues that its broiler farming operation is a new, separate and distinct business. Granted that if plaintiff is presently engaged in a farming operation by virtue of having created a new division, the question arises as to what sort of operation it was engaged in prior to September 1, 1958. The court is convinced that plaintiff did not substantially change its over-all operation on September 1, 1958, by the creation of the broiler division to handle the operation that the plaintiff had operated through its other two departments during the previous years. The "new" division was created within an existing corporate entity which at all times previous to and subsequent to September 1, 1958, has remained the same taxable entity. The creation of the new division was a convenience and perhaps an economic necessity to the plaintiff, and by concurrent utilization of the new form of contracts with the farmers, the plaintiff acquired more control over the growing and marketing of the chickens, but the fact remains that as a farming or nonfarming enterprise the plaintiff's over-all operation for the past ten years or more was the growing and marketing of broilers.

Even if the broiler farming division constituted a new business, the further question arises whether the broiler farming operation was "separate and distinct."

The controlling regulation, 26 C.F.R., Sec. 1.446–1(d), based upon 26 U.S.C. § 446(d), is as follows:

"(d) *Taxpayer engaged in more than one business.* (1) Where a taxpayer has two or more separate and distinct trades or businesses, a dif-

ferent method of accounting may be used for each trade or business, provided the method used for each trade or business clearly reflects the income of that particular trade or business. For example, a taxpayer may account for the operations of a personal service business on the cash receipts and disbursements method and of a manufacturing business on an accrual method, provided such businesses are separate and distinct and the methods used for each clearly reflect income. The method first used in accounting for business income and deductions in connection with each trade or business, as evidenced in the taxpayer's income tax return in which such income or deductions are first reported, must be consistently followed thereafter.

"(2) No trade or business will be considered separate and distinct for purposes of this paragraph unless a complete and separable set of books and records is kept for such trade or business.

"(3) If, by reason of maintaining different methods of accounting, there is a creation or shifting of profits or losses between the trades or businesses of the taxpayer (for example, through inventory adjustments, sales, purchases, or expenses) so that income of the taxpayer is not clearly reflected, the trades or businesses of the taxpayer will not be considered to be separate and distinct."

The regulation requires not only separate and distinct businesses, but also the keeping of separate and distinct books for each of the businesses. As to the operations of the plaintiff, its feed, hatchery and broiler departments are interdependent. The volume of the outside sales of feed and chicks is small compared to the transfers at cost of feed and chicks to the broiler division by the other two departments. There is no doubt but that plaintiff functions as a corporate entity made up of three well-integrated departments, not as a loose confederation made up of autonomous divisions. Whatever internal arrangements have been worked out over the years have not altered its corporate image in dealing with growers or in entering the chicken market as a seller. As the court concluded in the Chemell case, supra, at page 948:

"* * * The term 'farm', by the definition of the regulations, includes poultry farms. The maintaining of a flock of hens producing eggs to be hatched into chicks and the growing of feed are argicultural pursuits and are parts of an integrated operation."

As for the requirement of "complete and separable" books, while it is true that the general ledger accounts of the plaintiff's three departments could be physically separated, the fact remains that the books of original entries, such as daily journals, were not physically separable. The plaintiff contends that its books were "complete and separable" to the extent that they "clearly reflected" the income from each of the departments as an economic unit and that this conformed to good accounting practice. While this may be true, this court must base its determination of the case upon the plaintiff as a taxable entity, and the integrated or separate status of its departmental operations must be ascertained as a matter of fact, not as a matter of bookkeeping entries in particular or of accounting practice in general. United States v. Ekberg, supra; Welp v. United States (D.C.Iowa 1952), 103 F.Supp. 551, reversed on other grounds 8 Cir., 201 F.2d 128, 129.

Therefore, because of the functional integration of the three departments of the plaintiff's business, as well as the fact that the plaintiff did not maintain a "complete and separable" set of books and records with respect to each division, the broiler division cannot be characterized as a "separate and distinct" business for tax accounting purposes, and the Commissioner was correct in requiring that the taxpayer use the same method

of accounting consistently with respect to all of its departments.

This brings the court to the final question which goes to the heart of the present case, that is, regardless of whether the plaintiff's broiler farming operation was new, separate and distinct or not, did the mixed or hybrid method of accounting used by the taxpayer clearly reflect its income for the taxable year in question?

■■ In other words, the vital question, as the court reads 26 U.S.C. § 446, is not whether the tax might be computed differently under the cash receipts and disbursements method, reaching a theoretical consistency as to all accounts, but whether so computed it would more "clearly reflect the income." The taxpayer is under the burden not only of showing that a different amount would result from the change in method, which would demonstrate an overpayment of its taxes, but that the cash basis would more "clearly reflect the income". This is an administrative problem left by the statute to be determined "in the opinion of the Commissioner." Lucas v. Kansas City Structural Steel Co., 281 U.S. 264, 50 S.Ct. 263, 74 L.Ed. 848. That official has a broad administrative discretion in determining the question, and it is beyond the power of the courts to overturn his decision unless the evidence clearly shows that he has abused his discretion. Schram v. United States, 118 F.2d 541 (6 Cir., 1941), at page 543.

In deciding whether there was an abuse of discretion on the part of the Commissioner in the case at bar, the court must first look to the law as it applies to the handling of inventories under the several methods of accounting as a clear reflection of income.

The controlling statute, 26 U.S.C. § 471, which pertains to the general rule for inventories, states:

"Whenever in the opinion of the Secretary or his delegate the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary or his delegate may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income."

The supporting regulations are found in 26 C.F.R., Secs. 1.471–1, –2, –3, –6, and in Sec. 1.446–1(b) (2) (i). The requirement of consistency of accounting practice is emphasized in Sec. 1.471–2(b), which states:

"It follows, therefore, that inventory rules cannot be uniform but must give effect to trade customs which come within the scope of the best accounting practice in the particular trade or business. In order clearly to reflect income, the inventory practice of a taxpayer should be consistent from year to year, and greater weight is to be given to consistency than to any particular method of inventorying or basis of valuation so long as the method or basis used is substantially in accord with Secs. 1.471–1 through 1.471–9. An inventory that can be used under the best accounting practice in a balance sheet showing the financial position of the taxpayer can, as a general rule, be regarded as clearly reflecting his income."

The historical basis for this requirement of consistency is reflected in the case of Massachusetts Mutual Life Ins. Co. v. United States, 288 U.S. 269, 53 S.Ct. 337, 77 L.Ed. 739 (1933), in which the court stated, beginning at page 273 of 288 U.S., at page 339 of 53 S.Ct.:

"The regulations of the Treasury under all the Revenue Acts since 1916 have required taxpayers to report on the cash or accrual basis, depending on which method was pursued in their accounting. Since the adoption of the Revenue Act of 1921 the requirement has been statutory. It is settled beyond cavil that taxpayers other than insurance companies may not accrue receipts and treat expenditures on a cash basis, or vice versa. Nor may they accrue

a portion of income and deal with the remainder on a cash basis, nor take deductions partly on one and partly on the other basis."

This requirement also extends to the reporting of inventories, especially since the presence or absence of a need for inventory governs the type of accounting rather than mere labels imposed by the taxpayer. This point was brought out in the case of Aluminum Castings Co. v. Routzahn, 282 U.S. 92, 51 S.Ct. 11, 75 L.Ed. 234 (1930), in which the court stated at page 99 of 282 U.S., at page 14 of 51 S.Ct.:

" * * * But whether a return is made on the accrual basis, or on that of actual receipts and disbursements, is not determined by the label which the taxpayer chooses to place upon it. The use of inventories, and the inclusion in the returns of accrual items of receipts and disbursements appearing on petitioner's books, indicate the general and controlling character of the account, Niles Bement Pond Co. v. United States, 281 U.S. 357, 360, [50 S.Ct. 251, 74 L.Ed. 901]; United States v. Anderson, supra, [269 U.S.] pp. 442, 443, [46 S.Ct. 131, 70 L.Ed. 347], and support the finding of the trial court that books and returns were on the accrual basis."

The reasoning of the court on this general subject seems to be that where the business activity of the taxpayer creates a need for the maintenance of an inventory, only the accrual method of bookkeeping can clearly reflect the taxpayer's income based on the inventory on hand as an income-producing factor. This reasoning is succinctly set forth in the case of Herberger v. Commissioner of Internal Revenue, 195 F.2d 293 (9 Cir., 1952), in which the court stated at page 295:

"In petitioners' business, the purchase and sale of merchandise—the purchase of cucumbers and other materials and supplies and the sale of pickles—were income-producing

factors. Therefore, in order to reflect their net income correctly, it was necessary to take inventories of merchandise on hand at the beginning and end of each taxable year and to use them in computing their net income. See §§ 29.22(c)–1 and 29.41–3(1) of Treasury Regulations 111. Petitioners did so take and use such inventories. Therefore no method of accounting in regard to purchases and sales correctly reflected their income except an accrual method. See § 29.41–2 of Treasury Regulations 111. To hold, as petitioners would have us hold, that the cash receipts and disbursements method of accounting clearly reflected their income would be to disregard §§ 29.22(c)–1, 29.41–2 and 29.41–3(1)."

The effect of a taxpayer's converting inventory to a cost factor rather than an income factor is pointed up in the case of Carter v. Commissioner of Internal Revenue, supra, in which the court stated at page 601 of 257 F.2d:

" * * * It therefore amounts simply to an effort by petitioner, in his desire to use his cost rather than inventory as a basis, retroactively to change his method of accounting, which cannot be done. He was permitted under the regulations on the 'farm-price' method of valuing inventory to exclude his breeding herd from inventory if he had chosen to do so. Not having made that election when he acquired the herd, he cannot retroactively make the change. See SoRelle v. Commissioner, 22 T.C. 459, and Frost v. Commissioner, 28 T.C. 1118."

Although the court was dealing here with a situation in which a taxpayer attempted to benefit from taxable gains from a sale of livestock, which properly should not have been included as inventory under the applicable statute, the court's reasoning in the cited case is analogous to the reasoning of the present case in that the value of consistent treatment of an inventory as an income-producing fac-

tor rather than a cost factor is emphasized. In accord, United States v. Ekberg, supra.

The key to the question of whether plaintiff's hybrid accounting method clearly reflects its income centers about the treatment of its inventories in the three departments. While it is generally agreed that plaintiff is engaged in a farming type enterprise, nevertheless it has chosen to maintain an accrual type of accounting which uses inventories as an income factor in the feed and hatchery departments. Previous to September 1, 1958, the broilers that were growing, or were of premarket age, on hand at the end of a taxable year were also included in the closing inventory. Since the creation of its broiler division, plaintiff has chosen to use its closing inventory of growing broilers as a cost item under the cash accounting method employed in the broiler division.

Due to the important role that the designation of inventories plays, it is well to analyze the different effects that the accrual and hybrid methods of accounting in its departments produced on the taxable income reported by the plaintiff.

Under an accrual method of accounting during the course of a taxable year, generally, inventories are reduced only by a sale of the inventory items at a profit. Thus, the inventory reduction (which reduces taxable income) is offset by gain from sales (which correspondingly increases taxable income), and the over-all income picture is balanced.

This was true of the plaintiff's business operation prior to September 1, 1958. Purchases by the feed and hatchery divisions were accrued as costs and resulted in increased inventories. The transfer of these items to the growers were treated as sales at market prices, and were reflected in the growers accounts receivable. Thus, such transfers led to a reduction in inventory, with a corresponding increase in gross profits from sales. Because of the balancing effect that the increased gross profit

from sales had over the reduction in inventories, the plaintiff's income picture was not distorted.

Under the hybrid method of accounting, which was introduced after September 1, 1958, the transfers of items from the feed and hatchery divisions were made at cost, resulting in no gross profit from sales, while at the same time these transfers caused a reduction in inventories carried by feed and hatchery. At the same time, the cost of these items was treated by the broiler division as an immediate business expense, and yet, since the broiler division was on the cash method, it did not carry inventories which would reduce the cost of sales at the close of the taxable year. Thus, each transfer from the feed and hatchery divisions resulted in a reduction of inventory without an offsetting gain, and became an expense in the broiler division without an offsetting inventory.

It is in this manner that the plaintiff's hybrid method of accounting failed to clearly reflect its income for the taxable year ending March 31, 1959. This failure is corrected by requiring that the broiler division report its income on the accrual method, which means that it must carry inventories.

Plaintiff argues that the treatment of inventories under its hybrid system need not meet the test of accuracy so long as it clearly, consistently, practically, honestly, and fairly reflects the taxable income, and plaintiff cites cases in support of this contention. While the court is not questioning plaintiff's honesty, the law requires as much accuracy as standard methods of accounting practice permit.

The leading case, which has reconciled the treatment of inventories with the clear reflection of income test, is Caldwell v. Commissioner of Internal Revenue, (2 Cir., 1953), 202 F.2d 112, in which the court beginning at page 114 stated:

"* * * As one of the rules of thumb to be used in applying this section, Treas.Reg. 111, § 29.41–2

states that 'in any case in which it is necessary to use an inventory, no method of accounting in regard to purchases and sales will correctly reflect income except an accrual method.' There can be no doubt that this provision applies to the case at bar in view of Treas.Reg. 111, § 29.22 (c)–1, which requires the use of inventories 'in every case in which the production, purchase, or sale of merchandise is an income-producing factor.'

"Since taxpayer does not challenge this latter Regulation—and, in fact, has always used inventories in computing his income—the primary issue on his appeal is the validity in the present case of Treas.Reg. 111, § 29.41–2. That Regulation was explicitly applied in Herberger v. C. I. R., 9 Cir., 195 F.2d 293, certiorari denied 344 U.S. 820, 73 S.Ct. 17, a case involving a pickle processing and merchandising business, in which the court expressly rejected those cases which might be construed to question the validity of the Regulation; see also Welp v. United States, D.C.N.D.Iowa, 103 F.Supp. 551, reversed on another ground, 8 Cir., 201 F.2d 128. We are disposed to follow these decisions, since we think the reasonableness of the Regulation as applied in the instant case cannot be seriously doubted. The use of inventories in computing income results in stating the expenses of a year's operations in terms of the cost of the goods actually sold during that year. Thus the profit from these operations will be stated accurately only if the income from all sales made during the year is taken into consideration. * * *

"The taxpayer argues that these considerations are irrelevant because I.R.C. § 41 requires only that the method used shall reflect his income clearly, not accurately. 'Clearly,' he says, means merely that the taxpayer's books be kept fairly and honestly. In support of this proposition he cites Osterloh v. Lucas, 9 Cir., 37 F.2d 277, 278, Huntington Securities Corp. v. Busey, 6 Cir., 112 F.2d 368, 370, and several other cases. None of these cases is directly in point, and, insofar as they do construe this statutory language to connote good faith rather than accuracy, we do not consider their interpretation correct in the present context. Indeed, the pertinent language in the Osterloh case appears discredited even in the Ninth Circuit in view of that court's recent decision in Herberger v. C.I.R., supra. While taxpayer's honesty and good faith have not been in the slightest impugned in the present case, we read 'clearly reflect the income' in I.R.C. § 41 to mean rather that income should be reflected with as much accuracy as standard methods of accounting practice permit."

In accord, Iverson's Estate v. Commissioner of Internal Revenue (8 Cir., 1958), 255 F.2d 1; and Boynton v. Pedrick (S.D.N.Y.1954), 136 F.Supp. 888, aff'd 2 Cir., 228 F.2d 745.

Not only is there indication that there was not a clear reflection of income for the taxable year ending March 31, 1959, but it is also apparent that this method provides the plaintiff with continuing opportunities from year to year to shift its income and profits between divisions. By transferring large quantities of feed, supplies and chicks to the broiler division near the close of the taxable year, the plaintiff could reduce its feed and hatchery inventories (resulting in decreased taxable income) and increase its expenses in the broiler division (also resulting in decreased taxable income), without recognizing any gain, since no gain would be realized in the cash basis broiler division until a sale of the broilers. In this manner, near the end of a good year, the plaintiff could reduce its over-all taxable income by inter-company transfers, and thereby distort its true income picture. Such distortion is not possible if the broiler division is on the accrual method, since then the transfers to broiler would result in increased inventories (reducing net deductions),

and would offset the inventory reduction from feed and hatchery.

In other words, under the controlling Internal Revenue statutes and regulations, which allow the utilization of any accounting method which clearly reflects the taxpayer's income, there is an inherent prohibition against any method that permits the taking of money out of one corporate pocket and putting it in another corporate pocket of the same taxpayer under the guise of a hybrid accounting system.

Therefore, under the facts in the instant case it is clear that the Commissioner was correct in determining that the plaintiff must follow its previously established accounting method in computing its broiler division income, and he acted within his discretion in requiring that all of the plaintiff's business activities be reported consistently for federal income tax purposes on the accrual method of accounting. As the Court of Appeals for the Eighth Circuit stated in United States v. Ekberg, supra, 291 F.2d at page 925:

" * * * The applicable standard is whether the accounting clearly reflects income, §§ 446(b), 471. The Commissioner's requirement that the taxpayer continue to follow his existing method was within his administrative discretion; that discretion is 'wide' and it is not in the province of this court 'to weigh and determine the relative merits of systems of accounting'. Brown v. Helvering, supra, at pages 203–205 of 291 U.S., at page 361 of 54 S.Ct.; Automobile Club of Mich. v. Commissioner, 353 U.S. 180, 189–190, 77 S.Ct. 707, 1 L.Ed.2d 746."

## CONCLUSIONS OF LAW

### 1.

The court has jurisdiction of the parties and of the subject matter of this case.

### 2.

Plaintiff has failed to sustain its burden of proof that the Commissioner's disapproval of the plaintiff's attempt to report its broiler division income on the cash method of accounting while it continued to report the income from the other divisions of its business on the accrual method, and his subsequent determination that the taxpayer must use the accrual method consistently with respect to all of its business income for the taxable year in question constituted an abuse of discretion.

### 3.

The plaintiff is not entitled to recover and a judgment dismissing its complaint at its cost is being entered today.