RICHARD C. AND NANCY J. SCHEIDT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Scheidt v. Commissioner
Docket No. 28462-89
United States Tax Court
T.C. Memo 1992-9; 1992 Tax Ct. Memo LEXIS 15; 63 T.C.M. (CCH) 1726; T.C.M. (RIA) 92009; January 6, 1992, Filed *15 Decision will be entered under Rule 155. Richard A. Sirus, for petitioners. Patricia Pierce Davis, for respondent. GERBER, Judge
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent, by means of a statutory notice of deficiency, determined an $ 18,884.03 deficiency in Richard C. and Nancy J. Scheidt's (petitioners) Federal income tax for taxable year 1986. After concessions, $ 10,655.39 of the income tax deficiency remains in dispute which is solely attributable to respondent's disallowance of a $ 26,250 depreciation deduction relating to petitioners' one thirty-sixth interest in a breeding stallion. The issues presented for our consideration are: (1) Whether petitioners' activity was an "activity not engaged in for profit" within the meaning of section 183; [1] and if so, (2) whether the breeding stallion was placed in service during the taxable year. *16 FINDINGS OF FACT Some of the facts have been stipulated and the stipulation of facts and attached exhibits are incorporated by this reference. At the time of the filing of the petition herein, petitioners were married and resided in Oak Lawn, Illinois. Petitioners filed a joint Federal income tax return for their 1986 taxable year. (Singular reference to petitioner shall denote Richard C. Scheidt). Petitioner is an attorney licensed in the State of Illinois. Prior to and continuing through 1986, petitioner's principal employment was as vice president and director of labor relations for Montgomery Ward and Company, Inc. (Montgomery Ward). During 1986 petitioner was away from home on business for Montgomery Ward a total of 70 days. In addition to his employment at Montgomery Ward, petitioner maintained a small separate legal practice and served as a director for the Chicago Heights National Bank. In 1980, Glen Church (Mr. Church) [2] incorporated a horse and breeding business in Manteno, Illinois, known as Church Farm, Inc. (Church Farm). Mr. Church was the founder of the Acme Propane Co. and the director of a bank. Following a series of heart attacks and open heart surgery, *17 Mr. Church could no longer endure the physical demands of full-time participation at Acme Propane. After his full-time involvement at Acme Propane ceased in 1978, he purchased Church Farm. The record is silent as to whether Mr. Church was experienced or knowledgeable about horses or the breeding of thoroughbred horses. Initially Mr. Church planned to jointly purchase Church Farm with someone other than petitioner. After that individual withdrew, Mr. Church solicited financial support from petitioner. Petitioner was acquainted with Mr. Church through other business endeavors and believed him to be a "lucky" businessman. Petitioner agreed to pay Mr. Church's asking price of $ 30,000 for a 20-percent interest in Church Farm. Mr. Church owned the remaining 80 percent. Prior to his investment in Church Farm petitioner had no involvement or experience in either horse breeding or racing. *18 Upon acquiring his interest, petitioner traveled to Manteno on most weekends where his initial involvement with Church Farm consisted primarily in preparing legal documents and collections. In addition, petitioner consulted with Mr. Church on various management decisions. Church Farm retained the services of a certified public accountant who prepared and submitted reports to petitioner. A subchapter S corporation election was made for Church Farm's Federal income tax purposes. Respondent has not contested the subchapter S deductions reported on petitioners' 1986 Federal income tax return. At the time of acquisition, Church Farm was a working farm, essentially operating as a facility for horse boarding and handling layups. The handling of layups refers to the boarding of an injured horse while the animal recovers. Mr. Church was intrigued by the prospect of breeding thoroughbred race horses. Shortly after their acquisition of Church Farm in 1980, petitioner and Mr. Church became aware of the success others were enjoying in the horse-breeding business and determined that Church Farm would enter the breeding business. To that end, Mr. Church and petitioner traveled to Lexington, *19 Kentucky, to purchase mares for breeding purposes. In their selection process petitioner and Mr. Church relied upon the recommendations of their farm manager, who possessed 20 years of experience in judging horses. Between 1980 and 1987, Church Farm purchased approximately five mares. During 1982, Church Farm possessed a stallion named Reverse which was bred with their newly acquired mares. With the possible exception of its first year, Church Farm was not profitable. In 1982, petitioner and Mr. Church traveled to Kentucky to look at a stallion their farm manager had recommended. This horse was a sibling of the horse they ultimately purchased. Impressed with the horse's pedigree and the seller's assurances, Church Farm entered into a partnership with Mr. J. D. Barton (Barton) whereby each partner purchased an undivided one-half interest in a thoroughbred stallion named Imperial Guard. The total purchase price for Imperial Guard, a bay colt born in 1978, sired by Northern Dancer ex Fleur, was $ 700,000. After Barton decided that he lacked the financial ability to continue as a partner, Church Farm purchased his interest in Imperial Guard in June 1982 for $ 375,000. After *20 acquiring the horse in 1982, Church Farm only bred Imperial Guard with its own horses. In 1984 Church Farm decided to offer for sale, through a syndication arrangement, 36 equal undivided interests in Imperial Guard. The price per share was somewhat arbitrarily set at $ 125,000. [3] Eight shares in the syndicate were sold at a price of $ 125,000 per share. In addition to his existing 20-percent interest in Church Farm, petitioner personally purchased on May 29, 1989, one of the eight syndicated shares sold by Church Farm. Church Farm retained ownership of the 28 remaining shares. In addition to the 1/36th ownership interest in the stallion, the terms of the syndication agreement provided that each share be entitled to one free nomination (breeding privilege) per breeding season. The typical stallion is capable of breeding 40 *21 mares per season, the preferred season being the 4-month period between January and April. A book of nominations is maintained on the stallion. Forty nominations constitutes a full book. Under the syndication agreement the syndicate manager, Mr. Church, was given four annual breeding privileges. The syndicate manager's responsibilities included: The care and management of Imperial Guard; the maintenance of books and records of account; the furnishing of annual statements to the shareholders reflecting receipts, expenditures, and the results of the breeding season. The books and records maintained by the syndicate manager were subject to inspection by the shareholders. Church Farm attempted to generate interest in Imperial Guard by placing advertisements in various horse-breeding publications, mailing out brochures, inviting members of the horse-breeding community to an annual barbecue at Church Farm, and during 1 year, running a 30-second television commercial for Imperial Guard. In addition, Mr. Church and petitioner traveled to Oklahoma and Kentucky on several occasions to generate interest for Imperial Guard in those more active markets. Imperial Guard was shipped to Oklahoma *22 for a breeding season where the stud fee was reduced in an attempt to create more demand for the horse. In connection with its advertising and promotional efforts, Church Farm incurred expenses of between $ 15,000 and $ 30,000, annually. Under the syndication agreement, shareholders were responsible for paying their proportional share of costs and expenses in connection with the maintenance, care, and promotion of the stallion; however, Church Farm paid these expenses and did not seek reimbursement from the shareholders. Syndication affords the original purchaser of a horse an opportunity to defray the cost of acquisition. More importantly it serves to increase the chances of producing a foal which will later prove to be a winner; this in turn increases the worth of the sire. A stallion with a proven record of siring winning foals commands greater stud fees and the value of the syndicated shares increases. People purchase shares in a syndicated horse for various reasons. Some may purchase shares purely as an investment in hopes that the horse will appreciate in value and that they will share in any income generated from the sale of additional nomination rights. Others may *23 purchase shares with the intention of breeding their own mares with the horse. Owning a share ensures the breeder's nomination right and protects against being foreclosed from a breeding opportunity if the stallion has a full book. Shareholders who do not own their own mares may choose to enter into a foal-sharing arrangement with someone who does own a mare. Foal sharing is an arrangement whereby the nomination right holder allows his breeding privilege to be utilized by someone else in exchange for an ownership interest in the resulting foal. The syndication agreement did not preclude foal-sharing arrangements. Six of the eight shareholders in the Imperial Guard syndicate actively used their nomination rights to breed horses. After syndication Church Farm continued to breed Imperial Guard both with its own mares and by entering into foal-sharing agreements. At the time he acquired his syndicated share and through the time of trial, petitioner did not personally own any horses with which to breed Imperial Guard, other than by virtue of his preexisting 20-percent ownership in Church Farm's mares. Petitioner did not utilize his annual breeding right to enter into a foal-sharing *24 arrangement. Based upon his personal financial situation and the general decline in the horse market, petitioner decided not to incur the expense of acquiring mares or foal sharing. OPINION Petitioner contends that he was actively engaged in the trade or business of horse breeding for profit with respect to his syndication share of Imperial Guard, and is therefore entitled to the depreciation deductions claimed. Petitioners bear the burden of proving respondent's deficiency determination is in error. Rule 142(a). Section 183(a) provides, in pertinent part, that if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed except as otherwise provided in section 183(b). An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 [trade or business] or under paragraph (1) or (2) of section 212 [expenses for the production of income]". Section 183(b) separates deductions claimed with respect to an activity not engaged in for profit into two categories, i.e., those that are not dependent upon a profit objective *25 and those that are so dependent. Under section 183(b)(1) the deductions which are not dependent upon a profit objective, such as interest, are allowable according to their governing sections. However, under section 183(b)(2), the deductions which are dependent upon a profit objective are deductible only to the extent that the gross income from the activity exceeds the deductions allowable under section 183(b)(1). The test for allowing deductions is whether the taxpayer engaged in the activity generating the expenses with an actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs. Although the taxpayer's expectation of profit need not be reasonable, there must be a good-faith objective of making a profit. Allen v. Commissioner, 72 T.C. 28, 33 (1979). Section 183(d) provides that, in the case of an activity which consists in major part of the breeding, training, showing, or racing of horses, if the gross income derived from the activity exceeds the deductions for any 2 of 7 consecutive taxable *26 years, then the activity shall be presumed to be engaged in for profit unless the Commissioner establishes to the contrary. Petitioner has not shown that he or Church Farm experienced a profit from horse-breeding enterprises and therefore such presumption has no effect in this case. The determination of whether the requisite profit objective exists depends upon all the surrounding facts and circumstances of the case. Golanty v. Commissioner, 72 T.C. 411 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(b), Income Tax Regs. In making this determination, more weight is accorded to objective facts than to the taxpayer's statement of intent. Siegel v. Commissioner, 78 T.C. 659, 699 (1982); Dreicer v. Commissioner, supra at 645; sec. 1.183-2(a), Income Tax Regs.Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of nine criteria normally considered for this purpose. The factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying *27 on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which were earned; (8) the financial status of the taxpayer; and (9) the presence of elements of personal pleasure or recreation. Allen v. Commissioner, supra at 34. No single factor, nor the existence of even a majority of the factors, is controlling. Golanty v. Commissioner, supra at 426; Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). As a preliminary matter, we must decide if petitioner's activities with respect to the corporation and his interest in the syndication are one activity or, as respondent contends, two separate activities. Should we determine them to be separate activities, then the syndication interest must be separately measured against the section 183 standard to determine whether the requisite profit objective existed. [4]
*28 The question of whether activities under common ownership constitute separate businesses has arisen in several contexts. See, e.g., Davis v. Commissioner, 65 T.C. 1014 (1976) (section 162); Nielsen v. Commissioner, 61 T.C. 311 (1973) (section 355); Davis v. Commissioner, 29 T.C. 878 (1958) (section 130); [5]Peterson Produce Co. v. Commissioner, 205 F. Supp. 229 (W.D. Ark. 1962) (section 446(d)), affd. 313 F.2d 609 (8th Cir. 1963). Whether the activities constitute a separate trade or business is essentially a question of fact. In relevant part, section 1.183-1(d)(1), Income Tax Regs., provides: where the taxpayer is engaged in several undertakings, each of these may be a separate activity, or several undertakings may constitute one activity. In ascertaining the activity or activities of the taxpayer, all the facts and circumstances of the case must be taken into account. Generally, the most significant facts and circumstances in making this determination are the degree of organizational and economic interrelationship of various undertakings, the business purpose which is (or *29 might be) served by carrying on the various undertakings separately or together in a trade or business or in an investment setting, and the similarity of various undertakings. Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities. The taxpayer's characterization will not be accepted, however, when it appears that his characterization is artificial and cannot be reasonably supported under the facts and circumstances of the case. If the taxpayer engages in two or more separate activities, deductions and income from each separate activity are not aggregated either in determining whether a particular activity is engaged in for profit or in applying section 183. * * *
Respondent would have us bifurcate petitioner's activities in the corporation and in the syndicate. Accordingly, respondent argues that because petitioner did not purchase a mare to breed with the stallion or actively attempt to use his syndicated interest in any way, petitioner did not begin nor was he engaged in the trade, business, or profit-making activity of breeding. Petitioner's position is that the relationship *30 between the corporation and the syndicate regarding Imperial Guard is so intertwined, both factually and contractually, that they cannot be bifurcated. On this record we conclude based on the facts and circumstances that petitioner was engaged in a single activity. In this case, petitioner was an active owner of a working farm which chose to syndicate its most valuable asset in hopes of further enhancing the value of that asset. The economic interrelationship of petitioner's undertakings is demonstrated by the fact that at the time he purchased his syndicated share, *31 his interest in Church Farm included a 20-percent interest in the 28 unsold shares. The strong degree of organizational interrelationship between the two undertakings is evidenced by the fact that Mr. Church, in addition to his ownership interest in Church Farm, was also the syndicate manager for Imperial Guard. Petitioner's two investments shared a common business purpose, the promotion and breeding of Imperial Guard in hopes of producing a winning foal. The commonality of management and interest shared by Church Farm and the syndicate yielded a situation in which the efforts expended by one would insure to the benefit of the other. We conclude that petitioner's treatment of his two investments as one activity is reasonably supported by the facts and circumstances of this case. We now proceed to analyze the factors set forth in section 1.183-2(b), Income Tax Regs.
1. Manner in Which Petitioner Carried On the Activity
The fact that a taxpayer carries on an activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit. Sec. 1.183-2(b)(1), Income Tax Regs. The syndication agreement provided *32 that the syndicate manager on behalf of the shareholders was responsible for the maintenance of separate books and records accurately reflecting all income and disbursements. These records were subject to inspection by the shareholders. We are convinced that petitioner's reliance on the syndicate manager to maintain complete and accurate records demonstrates that petitioner carried on the activity in a businesslike manner. 2. The Expertise of the Taxpayer or His Advisor
Petitioner, admittedly, had no expertise or knowledge regarding the breeding, care, or sale of horses prior to his investment in Church Farm. Careful investigations of a potential business to insure the best chance for profitability strongly indicate an objective to engage in the activity for profit. Sec. 1.183-2(b)(2), Income Tax Regs.[6] While a formal market study is not required, a basic investigation of the factors that would affect profit is required. Underwood v. Commissioner, T.C. Memo. 1989-625; Burger v. Commissioner, T.C. Memo. 1985-523, affd. 809 F.2d 355 (7th Cir. 1987). Petitioner did not conduct an investigation before commencing his *33 entrance into the horse boarding or breeding business. Petitioner lent his financial support to the venture because he believed Mr. Church to be a "lucky" businessman in other unrelated endeavors. While petitioner may have entered the activity as a novice, his testimony at trial demonstrated that he acquired considerable knowledge in many facets of the horse-breeding business. Prior to petitioner and Mr. Church's acquisition of Church Farm, the facility was a working farm which boarded horses and handled layups. Petitioner and Mr. Church, as the owners of Church Farm, employed a farm manager whose recommendations they relied upon when selecting horses to purchase. Church Farm's decision to purchase Imperial Guard was made pursuant to the farm manager's recommendation. Petitioner testified that he believed the syndicated share was a better investment than acquiring *34 a greater share in Church Farm, which up to that time was not profitable. We are convinced that petitioner based his decision to increase his interest in the activity by investing directly in the asset he believed to be most valuable on the knowledge and experience he had accumulated through his continuing involvement with Church Farm. 3. The Time and Effort Expended by the Taxpayer in Carrying On the Activity
Prior to and continuing through 1986, petitioner's principal employment was as vice president and director of labor relations for Montgomery Ward. This position necessitated petitioner's being away from home on business 70 days in 1986. In addition to his principal employment, petitioner maintained a small separate legal practice and served as a a director of a bank. This Court has held that full-time employment does not preclude a finding that the activity was engaged in with the requisite profit objective. Givens v. Commissioner, T.C. Memo. 1989-529. The fact that a taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of a profit objective where the taxpayer employs competent and qualified persons to *35 carry on the activity. Sec.1.183-2(b) (3), Income Tax Regs. Upon acquiring his 20-percent interest petitioner traveled to Manteno on most weekends and became an active participant in the management of Church Farm, devoting his skills to the ongoing operation. Based on the degree of organizational and economic interrelationship of Church Farm and the Imperial Guard syndicate these efforts if successful would, of necessity, confer a benefit to petitioner in both his ownership capacities. While petitioner as an individual syndicate shareholder did not utilize his annual nomination right, Church Farm was actively breeding and promoting the stallion. Petitioner testified that he was relying upon Church Farm or the syndicate manager [7] to promote Imperial Guard. In light of the fact that petitioner and Mr. Church were "Church Farm", petitioner was in essence relying upon his own and his corporation's efforts. *36 4. The Expectation That Assets Used in the Activity May Appreciate in Value
In addition to helping defray the costs of acquisition, petitioner and Mr. Church, as the owners of Church Farm, decided to syndicate Imperial Guard in order to increase the chances of producing a winning foal, thereby increasing the value of the stallion. Petitioner contends that he was motivated to purchase his 1/36th share for much the same reason, that is, in anticipation that the stallion would prove himself capable of siring winning foals, thereby increasing the value of his share. While petitioner did not utilize his nomination right, we find that alone insufficient to conclude that petitioner did not anticipate that the value of the underlying asset would appreciate. 5. The Success of the Taxpayer in Carrying On Similar or Dissimilar Activities
The fact that petitioner, a licensed attorney, held a high level executive position with Montgomery Ward as well as serving as a director of the Chicago Heights National Bank demonstrates that petitioner enjoyed professional success. We are surprised that someone with petitioner's negotiation skills and financial acumen did not conduct a more *37 careful investigation before proceeding into the horse -breeding business. Although petitioner perhaps could have done more to achieve the success he hoped for, he was relying upon the judgment and expertise of others he considered successful to make the activity thrive. 6. The Taxpayer's History of Income or Losses With Respect to the Activity
While it is true that petitioner never recognized a profit, we note that a series of losses during the initial startup stage of an activity does not necessarily indicate that the activity was not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. The startup period for a horse-breeding operation is 5 to 10 years. Engdahl v. Commissioner, 72 T.C. 659, 669 (1979). The years in issue fall within this startup period. Losses sustained because of unforeseen or fortuitous circumstances beyond the control of the taxpayer do not indicate that the activity was not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. Petitioner contends that his lack of success is attributable to the unforeseen decline in the horse market. As noted above, petitioner failed to conduct a basic investigation before entering *38 into the horse boarding or breeding business. When a taxpayer fails to make a proper investigation into market conditions this Court has been reluctant to characterize a decline in the market as unforeseen. Underwood v. Commissioner, T.C. Memo. 1989-625. 7. The Amount of Occasional Profits, if Any, Which Were Earned
As noted above, there was no showing that petitioner's activity earned a profit. 8. The Financial Status of the Taxpayer
The fact that a taxpayer has substantial income from sources other than the activity, particularly when the losses from the activity generate substantial tax benefits, may be an indication that the activity is not engaged in for profit. Sec. 1.183-2(b)(8), Income Tax. Regs. Petitioner is a successful professional who in 1986 had relatively substantial wage, interest, and dividend income. While petitioner's economic status was such that he could afford to sustain losses and at the same time benefit from the resulting tax advantages, we note that this is not a case where a taxpayer, through a series of promissory notes and inflated valuations, actually paid only a minimal sum and then claimed large depreciation and *39 operating expenses. Petitioner in this case actually paid the $ 125,000 price for his syndicated share and depreciated this outlay over the prescribed period. 9. Elements of Personal Pleasure or Recreation
We do not find that petitioner was motivated by elements of personal pleasure or recreation. While petitioner testified that he believed his wife, who was in poor health, might enjoy seeing foals born, we are convinced that petitioner perceived this to be an incidental benefit. Upon consideration of all the facts and circumstances we find that petitioner did engage in a horse-breeding activity with an actual and honest objective of making a profit. We now address the issue of whether the asset was placed in service. Section 167(a) provides in part: There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) -- (1) of property used in a trade or business, or (2) of property held for the production of income.
Section 1.167(a)-10(b), Income Tax Regs., provides that the "period for depreciation of an asset shall begin when the asset is placed in service". *40 Section 1.167(a)-11(e)(1)(i), Income Tax Regs., provides in part: "Property is first placed in service when first placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity." Respondent asserts that because petitioner neither purchased a mare to breed with the stallion, entered into a foal-sharing agreement, sold or traded his nomination right, nor advertised his annual breeding right, petitioner failed to demonstrate a good- faith effort to make his interest in the stallion available and ready for use in a trade or business. Petitioner contends that his failure to individually advertise his interest is attributable to his reliance upon the advertising efforts of the syndicate manager. Petitioner further asserts that based on the less than overwhelming response to the syndicate's advertising, any individual promotion would have been futile and imprudent. We agree with petitioner. The syndicate manager was spending between $ 15,000 and $ 30,000 annually to promote the stallion. The stallion was in fact being bred and remained *41 in a state of readiness and available for increased breeding activity had the advertising efforts which petitioner relied upon generated the hoped-for demand. We, therefore, find that the asset was "placed in service". We conclude that petitioner did engage in a horse-breeding activity with an actual and honest profit objective and that the asset for which a depreciation deduction was claimed was "placed in service" within the meaning of section 1.167(a)-11(e)(1)(i), Income Tax Regs.
To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court's Rules of Practice and Procedure.↩
2. During the trial Mr. Church was referred to as Glen Church; however, the syndication agreement refers to him as Gilbert Church.↩
3. Once the decision to syndicate was made, the price per share and the stud fees were arrived at by comparing the amounts other breeders were commanding for horses of comparable pedigree.↩
4. See Givens v. Commissioner, T.C. Memo. 1989-529↩.
5. This case arose under sec. 130 of the 1939 Code. This provision, sometimes referred to as the "hobby amendment", disallowed trade or business losses of individuals under certain circumstances and applied separately to each trade or business. Sec. 130 of the 1939 Code was reenacted as sec. 270 of the 1954 Code. Sec. 270 was repealed for taxable years beginning after Dec. 31, 1969. Tax Reform Act of 1969, Pub. L. 91-172, sec. 213(b), 83 Stat. 572.↩
6. See also Underwood v. Commissioner, T.C. Memo. 1989-625; McLarney v. Commissioner, T.C. Memo. 1982-461↩.
7. In response to questions regarding advertising and promotion of Imperial Guard, petitioner used Church Farm and syndicate manager as interchangeable phrases.↩